Scott T. Nonaka (SBN 224770)
snonaka@sidley.com
Irene Yang (SBN 245464)
irene.yang@sidley.com
Naomi A. Igra (SBN 269095)
naomi.igra@sidley.com
Stephen Chang (SBN 312580)
stephen.chang@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Phone: (415) 772-1200
Fax: (415) 772-7400

Seferina Berch (*pro hac vice* forthcoming)
sberch@sidley.com
Michael McGuinness (*pro hac vice* forthcoming)
mmcguinness@sidley.com
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Phone: (212) 839-5300
Fax: (212) 839 5599

Jingni (Jenny) Zhao (SBN 284684)
jennyz@advancingjustice-alc.org
Glenn Michael Katon (SBN 281841)
glennk@advancingjustice-alc.org
Anoop Prasad (SBN 250681)
anoopp@advancingjustice-alc.org
ASIAN AMERICANS ADVANCING JUSTICE
– ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, CA 94111
Phone: (415) 848-7710
Fax: (415) 896-1702

Judah Lakin (SBN 307740)
judah@lakinwille.com
Amalia Wille (SBN 293342)
amalia@lakinwille.com
LAKIN & WILLE LLP
1939 Harrison Street, Suite 420
Oakland, CA 94612
Phone: (510) 379-9216
Fax: (510) 379-9219

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRO LEGAL DE LA RAZA; IMMIGRANT LEGAL RESOURCE CENTER; TAHIRIH JUSTICE CENTER; REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES,<br><br>Plaintiffs,<br><br>v.<br><br>EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; JAMES MCHENRY, Director, Executive Office for Immigration Review; UNITED STATES DEPARTMENT OF JUSTICE; JEFFREY A. ROSEN, Acting United States Attorney General,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**ADMINISTRATIVE PROCEDURE ACT CASE**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

JURISDICTION AND VENUE ............................................................................................3

INTRADISTRICT ASSIGNMENT ......................................................................................4

PARTIES ...............................................................................................................................4

FACTUAL ALLEGATIONS ................................................................................................7

I.      Background to the Rule ..............................................................................................7

   **A.**    Constitutional and Statutory Protection for Those in Removal Proceedings ............7

   **B.**    Procedures in Immigration Court and the BIA before the Rule ................................9

   **C.**    Backlogs and a Barrage of New Rulemaking ........................................................16

II.     The Rule.....................................................................................................................20

   **A.**    Notice of Proposed Rulemaking ............................................................................20

   **B.**    The Final Rule.........................................................................................................22

III.    The Rule Violates the Procedural and Substantive Requirements of the APA. ..........24

   **A.**    Defendants' Rulemaking Process Was Fatally Flawed .........................................24

   **B.**    Director McHenry Issued the Rule Without Valid Authority..................................29

   **C.**    The Rule Effects Numerous Procedural Changes That Are Contrary to Law and Arbitrary and Capricious....................................................................................................31

   **D.**    Defendants Failed to Comply with Federalism Certification Requirements ............70

   **E.**    Defendants Failed to Comply With the Regulatory Flexibility Act. ........................71

IV.    The Rule Harms Plaintiffs .........................................................................................73

   **A.**    The Rule Frustrates Plaintiffs' Missions................................................................73

   **B.**    The Rule Diverts Resources from Plaintiffs' Core Programs..................................75

   **C.**    The Rule Jeopardizes Plaintiffs' Funding...............................................................77

CLAIMS FOR RELIEF.........................................................................................................78

   FIRST CLAIM FOR RELIEF
     Violation of the APA (Arbitrary and Capricious)..................................................78

   SECOND CLAIM FOR RELIEF
     Violation of the APA (Without Observance of Procedure Required by Law) ......80

   THIRD CLAIM FOR RELIEF
     Violation of the APA, 5 U.S.C. § 706(2)...............................................................82

   Agency Action in Excess of Statutory Jurisdiction or Authority ......................................82

   FOURTH CLAIM FOR RELIEF
     Violation of the APA, 5 U.S.C.§ 706(2)................................................................83

   Contrary to Law and In Excess of Statutory Authority ....................................................83

   FIFTH CLAIM FOR RELIEF
     Violation of the Due Process Clause ......................................................................85

JURY DEMAND...................................................................................................................86

i

PRAYER FOR RELIEF.................................................................................................................86

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.     This action challenges a rushed, unlawful, and arbitrary final rule that strips away procedural protections for immigrants, restricts the authority of immigration judges, and obstructs critical forms of relief for people at risk of deportation. *Appellate Procedure and Decisional Finality in Immigration Proceedings; Administrative Closure*, 85 Fed. Reg. 81,588 (Dec. 16, 2020) ("the Rule"). The Rule's overhaul of procedures in the Board of Immigration Appeals ("BIA") and limitations on the authority of judges dramatically disadvantage immigrants seeking to establish their claims. The Rule is part of a barrage of new regulations the Trump Administration promulgated in a single week in December as part of its final assault on immigrants and organizations like Plaintiffs that defend their rights. Like so many other rules the Trump Administration promulgated in its final year, the Rule is unlawful and must be stayed, enjoined, or set aside.

2.     The Rule imposes procedural changes that block critical avenues for relief in immigration courts and the BIA. For example, the Rule eliminates administrative closure, which is a vital case management tool that allows immigration judges to hold cases in abeyance pending action by a party over which they have no control, including the United States Citizenship and Immigration Services ("USCIS"). This tool is particularly important in the cases of immigrants with statutory claims for humanitarian relief that immigration courts cannot provide, such as Special Immigrant Juvenile Status ("SIJS"), and U visas for victims of crimes who have suffered substantial mental or physical abuse. The Rule also limits the authority of immigration judges to grant *sua sponte* motions to reopen or reconsider cases where warranted to prevent manifest injustice. It also imposes a new simultaneous briefing regime and dramatically shortens the time for briefing on appeal. The result is a sudden overburdening of legal service providers and pro bono counsel who will not be able to continue to provide high quality representation to as many noncitizens.

3.     As with other anti-immigrant rules the Trump Administration promulgated, the Rule violates the procedural and substantive requirements of the Administrative Procedure Act ("APA").

4. *First*, the Rule was proposed as part of a series of hurried and interrelated new rules fraught with problems. The public was denied a meaningful opportunity to comment on the Rule because of a staggered rulemaking process. This problem was exacerbated by Defendants' decision to permit only 30 days for comment in the midst of a global pandemic, as well as the crush of multiple proposed rules hitting the same community around the same time. The result is a Rule that is arbitrary and capricious for failing to consider the interplay and cumulative effect of all the various rules on Plaintiffs and the populations they serve.

5. *Second*, the Rule was impermissibly signed by the Director of the Executive Office for Immigration Review ("EOIR"), Director James McHenry. 85 Fed. Reg. at 81,656. Director McHenry does not have authority to issue the Rule under 8 U.S.C. § 1103(g)(2). The Rule asserts generally that the Attorney General delegated authority to Director McHenry, but where a statute requires a specific delegation of authority, a more general delegation of authority does not suffice. In this case, it is easy to see why. In the Rule, EOIR Director McHenry purported to use generally delegated authority to delegate additional specific adjudicatory authority from the Attorney General to himself. The public could not have anticipated this dangerous result; the language of the proposed rule, and even the language of the final rule, indicated that the Attorney General would sign the rule. The rush to finalize the Rule without the Attorney General's authorization denied the public an opportunity to comment on the EOIR Director's misuse of delegated authority.

6. *Third*, the Rule is contrary to law because the cumulative effect of its provisions is incompatible with the overall statutory scheme governing the immigration courts and the BIA. The Rule alters procedures in immigration court and the BIA in ways that undermine statutory protections codified in the Immigration and Nationality Act ("INA"), including the statutory rights to counsel and a full and fair hearing, which are necessary to protect against persecution and torture.

7. *Fourth*, the Rule is arbitrary and capricious. Defendants promulgated the Rule without giving adequate consideration to the serious harm it will inflict on immigrants and their advocates. They also failed to provide a rational explanation for abandoning longstanding

practices that protect the rights of those in removal proceedings and disregarded the significant reliance interests at stake. The Rule's radical alteration of EOIR procedures is not rationally connected to Defendants' stated goal of achieving efficiency, and Defendants ignored comments offering alternative strategies and pointing out the reasons why the Rule's changes would only cause chaos, waste resources, and increase the backlog of cases pending in the immigration courts and the BIA.

8.      *Fifth*, in their rush to promulgate the Rule, Defendants failed to conduct the analysis required under the Regulatory Flexibility Act ("RFA"). Had they conducted that analysis, they would have been required to acknowledge and address the significant impact of the Rule on small entities, including some of the Plaintiffs in this case.

9.      *Sixth*, the Rule is contrary to law because it violates the Due Process Clause of the United States Constitution by obstructing the statutory pathway through immigration courts and the BIA for people in removal proceedings and their pro bono legal service providers.

10.     The Rule is already causing irreparable harm to Plaintiffs. The Rule hit a community already reeling from an onslaught of anti-immigrant policy changes in the Trump Administrations' final year, including six new anti-immigrant rules issued in a single week in December, right before the holidays and in the midst of a COVID-19 surge. All of the rules were issued with a 30-day effective date and timed to take effect within days of each other. Under the pressure of COVID and holiday business closures, Plaintiffs have consumed precious resources in a push to complete as much work as possible for those subject to the Rule before imposition of the new regime. But there is nothing more Plaintiffs can do on their own to mitigate the harm from this Rule. The Court's intervention is necessary to prevent further harm to Plaintiffs, the populations they serve, and the public.

## JURISDICTION AND VENUE

11.     This case arises under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, and this Court has subject matter jurisdiction under 28 U.S.C. § 1331.

12.     Venue is proper in this district under 28 U.S.C. § 1391(e) because Defendants are agencies of the United States and federal officers acting in their official capacity and Plaintiffs

Centro Legal de la Raza ("Centro Legal") and Immigration Legal Resource Center ("ILRC") have their principal places of business and reside in this district.

13.     Defendants' publication of the final Rule in the Federal Register on December 16, 2020 constitutes final agency action subject to judicial review. 5 U.S.C. §§ 704, 706.

14.     Plaintiffs have standing to challenge the Rule under 5 U.S.C. § 702 because they have been and will continue to be injured by the Rule's operation. Plaintiffs are also within the zone of interest of the INA. *See, e.g., E. Bay Sanctuary Covenant v. Trump,* 950 F.3d 1242, 1270 (9th Cir. 2020) ("*EBSC II*"); *La Clinica de La Raza v. Trump*, No. 19-cv-04980-PJH, 2020 WL 4569462, at *9–11 (N.D. Cal. Aug. 7, 2020), *amended and superseded by* 2020 WL 6940934 (N.D. Cal. Nov. 25, 2020), *reconsideration granted by* 2020 WL 7053313 (N.D. Cal. Nov. 25, 2020).

## INTRADISTRICT ASSIGNMENT

15.     Assignment to the San Francisco or Oakland Division of this Court is proper under Local Rule 3-2(d) because this action arises in San Francisco County.

## PARTIES

16.     Plaintiff Centro Legal is a nonprofit legal services agency in Oakland, California. Founded in 1969, Centro Legal protects and advances the rights of low-income, immigrant, Black, and Latinx communities through bilingual legal representation, education, and advocacy. Centro Legal's immigration practice includes comprehensive, full-service direct representation; legal rights education; and local and national advocacy. Centro Legal is on the list of Pro Bono Legal Service Providers that EOIR provides to noncitizens in removal proceedings. Centro Legal provides legal representation to individuals in removal proceedings before the immigration courts, BIA and the Ninth Circuit Court of Appeals. Centro Legal specializes in detained and non-detained removal defense, with a particular focus on asylum seekers and the intersection of immigration and criminal law. Centro Legal also runs a robust pro bono immigration program. It trains and provides technical and substantive assistance for pro bono attorneys representing clients seeking asylum, U visa relief, and SIJS before the immigration courts, BIA, state court, and USCIS. In addition, Centro Legal engages in policy advocacy to seek systemic change to the

immigration system and to promote the rights of individuals on a local, regional, and national scale. In 2019, Centro Legal's annual revenue was less than $10 million, and it qualifies as a small entity under the RFA. If the Rule remains in effect, it will require Centro Legal to divert resources away from critical operations and impede Centro Legal's ability to carry out its mission.

17. Plaintiff ILRC is a national nonprofit organization headquartered in San Francisco, California. ILRC's mission is to collaborate with and educate immigrants, community organizations, and the legal sector to build a democratic society that values diversity and the rights of all people. ILRC provides training to attorneys, paralegals, and community-based advocates who work with immigrants around the country. To assist practitioners, ILRC produces immigration law practice manuals on a variety of topics, including removal defense, asylum, U-visas, T-visas, SIJS, and naturalization. ILRC also publishes practice advisories, conducts trainings, and provides technical assistance to advocates on a variety of immigration topics. As a key part of its mission, ILRC's Immigrant Post-Conviction Relief Project engages in federal, state, and local advocacy to advance the rights of immigrants with criminal convictions, and assists advocates in understanding how to better serve this population. ILRC is in the process of coordinating implementation and training for the California Immigrant Justice Fellowship, the first California-sponsored legal fellowship program to expand access to counsel in the most underserved rural regions of the state. The publication of the Rule has required ILRC to divert resources from its core activities to address the Rule's impact on the communities it serves. If the Rule remains in effect, it will require further diversion of resources and impede ILRC's ability to carry out its mission.

18. Plaintiff Tahirih Justice Center ("Tahirih") is a national nonprofit organization that was founded in 1997 and is headquartered in Falls Church, Virginia, with offices in Atlanta, Georgia, Baltimore, Maryland, Houston, Texas, and San Bruno, California. Tahirih's annual revenue for 2019 was just over $10 million. Tahirih offers legal representation and social services for individuals who seek protection, including asylum, T and U nonimmigrant status, and protection under the Violence Against Women Act ("VAWA"). In addition, Tahirih devotes significant resources to providing limited advice and information services to individuals for whom

it cannot provide full scope representation, and information to immigrants through Know-Your-Rights presentations. Through administrative advocacy, legislative campaigns, and outreach, Tahirih aims to increase the efficiency and fairness of the asylum system. Tahirih leverages its expertise by working directly in a co-counsel relationship with pro bono attorneys on many of its cases. Tahirih's current pro bono network includes 2,770 attorneys from nearly 490 law firms across the country. For these pro bono partners, Tahirih creates and provides extensive training and education, as well as sample pleadings, templates, articles, expert reports, and other written materials to assist them. Tahirih also conducts regular updates, webinars, and additional education as necessary to update its pro bono partners on new developments in the law. If the Rule remains in effect, Tahirih will not be able to effectively engage pro bono partners to represent its clients. It will also require a continued diversion of resources away from critical operations and impede Tahirih's ability to carry out its mission.

19.   Plaintiff Refugee and Immigrant Center for Education and Legal Services ("RAICES") is a national nonprofit organization founded in 1986 by community activists as the Refugee Aid Project. RAICES is headquartered in San Antonio, with offices in Austin, Corpus Christi, Dallas, Fort Worth, Houston, and San Antonio. RAICES's mission is to defend the rights of immigrants and refugees; empower individuals, families, and communities; and advocate for liberty and justice. A diverse staff of approximately 283 attorneys, legal assistants, social workers, advocates, and support staff provide 'know your rights' trainings, consultations, direct legal services representation, social services assistance, and advocacy work on behalf of immigrants throughout Texas. In 2019, RAICES managed 28,257 legal cases. RAICES represents unaccompanied children, family units, and individuals, including detained immigrants and children in ORR custody, in matters before USCIS, the immigration courts, the BIA, Juvenile Texas State Courts, and U.S. Federal Courts. RAICES is on the list of Pro Bono Legal Service Providers that EOIR provides to noncitizens in removal proceedings.

20.   Defendant EOIR is a sub-agency within the U.S. Department of Justice ("DOJ") to which the Attorney General has delegated authority to interpret the immigration laws and adjudicate removal cases. EOIR administers the immigration courts and the BIA.

21.     Defendant James McHenry is the Director of EOIR and is sued in his official capacity.

22.     Defendant DOJ is a cabinet-level department of the federal government.

23.     Defendant Jeffrey A. Rosen is the Acting Attorney General of the United States and the most senior official in the DOJ. Under 8 U.S.C. § 1103(g), the Attorney General is responsible for the administration of immigration law. Defendant Rosen is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I.     Background to the Rule

#### A.     Constitutional and Statutory Protection for Those in Removal Proceedings

24.     Individuals in removal proceedings are protected by the Due Process Clause of the United States Constitution. In particular, "due process requires that [removal] hearings be fundamentally fair." *Rosales v. ICE*, 426 F.3d 733, 736 (5th Cir. 2005); *see also Oshodi v. Holder*, 729 F.3d 883, 889 (9th Cir. 2013) (en banc);  *Biwot v. Gonzales*, 403 F.3d 1094, 1098–99 (9th Cir. 2005); *Borges v. Gonzales*, 402 F.3d 398, 408 (3d Cir. 2005).

25.     The INA is a comprehensive statutory scheme that creates a pathway through the immigration courts and the BIA for people to present defenses to removal and claims for relief. The INA requires an immigration judge to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the [applicant] and any witnesses." 8 U.S.C. § 1229a(b)(1). It also provides that applicants "shall have a reasonable opportunity to examine the evidence against [her], to present evidence on [her] own behalf, and to cross-examine witnesses presented by the Government." *Id.* § 1129a(b)(4)(B).

26.     The INA specifies that noncitizens are entitled to be "represented, at no expense to the Government, by counsel of the [applicant's] choosing." *Id*. §§ 1229a(b)(4)(A), 1362. For that reason, EOIR maintains a List of Pro Bono Legal Service Providers (the "List") that "shall be provided to individuals in removal and other proceedings before an immigration court." *Id.* § 1229(b)(2); 8 C.F.R. § 1003.61(b).

27.     The INA also addresses the right to apply for and be granted certain forms of relief from removal. For example, the INA incorporates the United States' treaty obligations to refugees

by providing that "[a]ny [noncitizen] who is physically present in the United States . . . irrespective of such [noncitizen's] status, may apply for asylum." 8 U.S.C. § 1158(a)(1). The INA also provides that "the Attorney General may not remove [a noncitizen] to a country if the Attorney General decides that the [noncitizen's] life or freedom would be threatened in that country" based on a protected ground. 8 U.S.C. § 1231(b)(3)(A); *see INS v. Stevic*, 467 U.S. 407, 422 (1984).

28.     Noncitizens in removal proceedings can assert eligibility for asylum as a defense to removal. Under the INA, immigration judges have authority to adjudicate asylum claims.

29.     The INA also offers other forms of humanitarian relief that are not adjudicated by immigration judges. For example, the INA provides for T visa petitions for survivors of human trafficking, U visa petitions for victims of certain crimes, and protection under VAWA. These forms of relief are adjudicated by USCIS.

30.     Under the INA, an order of removal issued by an immigration judge is not final until either the BIA has affirmed the order or the time to appeal to the BIA has expired. 8 U.S.C. § 1101(a)(47)(B).

31.     The INA protects the right to a meaningful appeal by requiring that "[t]he determination of the immigration judge shall be based only on the evidence produced at the hearing," 8 U.S.C. § 1229a(c)(1)(A), and that "a complete record shall be kept of all testimony and evidence produced" in immigration court. *Id.* § 1229a(b)(4)(C).

32.     In addition to appeal to the BIA, the INA provides other mechanisms to ensure opportunities for those in removal proceedings to present a full range of defenses. For example, the INA provides for one motion to reconsider within 30 days of a removal order. 8 U.S.C. § 1229a(c)(6)(B). A motion to reconsider is based on legal grounds and seeks a new determination based on alleged errors of fact or law. *Ayala v. Sessions*, 855 F.3d 1012, 1020 (9th Cir. 2017).

33.     The INA also guarantees noncitizens the opportunity to file a motion to reopen their removal proceedings. "A motion to reopen is a traditional procedural mechanism in immigration law with a basic purpose that has remained constant—to give [noncitizens] a means to provide new information relevant to their cases to the immigration authorities." *Meza-Vallejos v. Holder*,

669 F.3d 920, 924 (9th Cir. 2012). It is "a form of procedural relief that asks the Board to change

its decision in light of newly discovered evidence or a change in circumstances." *Guerrero-*

*Lasprilla v. Barr*, 140 S. Ct. 1062, 1067 (2020) (citation omitted) (quoting *Dada v. Mukasey*, 554

U.S. 1, 14, 13 (2008)).

34.     The INA generally allows for one motion to reopen within 90 days of a final

administrative order of removal. 8 U.S.C. § 1229a(c)(7)(C)(i).

35.     Both motions to reconsider and motions to reopen must be filed with the

adjudicatory body that last had jurisdiction over the case—either the immigration court that

ordered the noncitizen removed if there was no appeal, or the BIA if there was an appeal. 8 C.F.R.

§ 1003.2(b)(2) (motions to reconsider before the BIA); 8 C.F.R. § 1003.23(b)(1) (motions to

reconsider before the immigration court); 8 C.F.R. § 1003.2(c)(2) (motions to reopen before the

BIA); 8 C.F.R. § 1003.23(b)(1) (motions to reopen before the immigration court).

36.     The INA also provides for an opportunity for voluntary departure for some

individuals in removal proceedings. Voluntary departure is a substantive grant of relief that allows

noncitizens to depart the United States without receiving a removal order. 8 U.S.C. § 1229c.

**B.     Procedures in Immigration Court and the BIA before the Rule**

**1.     Administrative Closure in Immigration Court**

37.     Immigration judges use a variety of procedural tools to efficiently manage their

heavy dockets. In particular, prior to the Rule, immigration judges were able to administratively

close removal proceedings for a variety of reasons, including to allow for the processing of relief

that can only be adjudicated by USCIS.

38.     Administrative closure "temporarily takes a removal case off of an immigration

judge's calendar, preventing it from moving forward," which enables a "noncitizen to pursue

alternative relief—such as a U visa—from USCIS." *Meza Morales v. Barr*, 973 F.3d 656, 664

(7th Cir. 2020) (internal citations omitted); *see also Gonzalez-Caraveo v. Sessions*, 882 F.3d 885,

889–91 (9th Cir. 2018).

39.     At least since the 1980s, immigration judges and the BIA have managed their

dockets with administrative closure. *See Matter of Avetisyan*, 25 I. & N. Dec. 688 (BIA 2012);

*Matter of Amico*, 19 I. & N. Dec. 652 (BIA 1988).

40.     Administrative closure is an important case management tool for several reasons. First, it conserves resources by sparing immigration courts and the parties from having to adjudicate potentially complex and difficult claims for people with easier avenues to relief. Those granted relief from USCIS can move to have their removal proceedings terminated or ask to have the case calendared to efficiently adjudicate a claim based on the USCIS grant. If USCIS denies relief, the case is "recalendared" before the immigration judge.

41.     Second, if an immigration judge issues a removal order to someone who is simultaneously pursuing a claim before USCIS, an applicant who is entitled to statutory protection can be removed from the United States and may face significant challenges returning to the United States even if USCIS ultimately grants relief. A removal order may have the practical effect of denying a person relief to which they are entitled under the INA. The alternative is for an immigration judge to continue the applicant's removal proceedings, but serial continuances are burdensome for the court and the parties who must prepare and adjudicate continuance motions and might have to travel long distances to appear only to have their hearings continued.[1]

42.     Despite nearly 40 years of the practice, the Attorney General issued a decision in 2018 that purported to unilaterally eliminate administrative closure except in very limited circumstances. *See Matter of Castro-Tum,* 27 I. & N. Dec. 271 (A.G. 2018). The Attorney General read regulations in place at that time as barring administrative closure. *Id.* But the Fourth and Seventh circuits rejected that reading. *See Meza Morales*, 973 F.3d at 667; *Romero v. Barr*, 937

---

[1] Public Comment of National Association of Immigration Judges at 2-3 (Sept. 25, 2020), https://tinyurl.com/y4lrl48f ("The use of administrative closure, to put a short term hold on cases not ready for completion, permits the Immigration Judge to attend to and resolve cases that are ready for resolution and allows immigration judges to complete more cases. . . [G]ranting a continuance in these situations is often not efficient. When a case is continued, it still occupies a position on our overcrowded dockets, and generates workload for judges and staff, and unnecessary time and expenditures for the parties before the Court."); Public Comment of Former Round Table of Immigration Judges at 2 (Sept. 24, 2020), http://bit.ly/3oFfRE8 ("In our decades of experience, the Court's ability to sensibly manage its docket through administrative closure allowed for disposition of cases with fairness and due process as a guiding objective. Objective evidence supports our considerable experience. A September 2020 analysis by TRAC of EOIR's own data determined that administrative closure helped reduce the backlog of cases at the Court, rather than contributing to the backlog.").

F.3d 282, 287, 297 (4th Cir. 2019). [2] Those courts recognized that the prior regulations gave immigration judges general authority to administratively close cases and that administrative closure is an effective case management tool.

### 2.      Briefing an Appeal at the BIA

43.     Parties have 30 days to file a notice of appeal with the BIA from an adverse decision by an immigration judge. The 30-day clock runs from the time the court issues an oral opinion or mails a written decision. 8 C.F.R. § 1003.38(b).

44.     At some point after a party files a notice of appeal, the BIA sends to the parties a transcript of the proceedings before the immigration judge, the immigration judge's order, and a briefing schedule. 8 C.F.R. § 1003.3(c)(1).

45.     There is no set timeline for the BIA to issue these materials. Those in removal proceedings and their counsel might wait weeks, months, or years before the BIA issues the transcript, order, and briefing schedule. 67 Fed. Reg. 54,877, 54,895 (Aug. 26, 2002).

46.     The appealing party's opening brief is due to the BIA within 21 days from the date the BIA issues the transcript, order, and briefing schedule. Before the Rule took effect, in the cases of non-detained noncitizens, the opposing party was ordered to file a responsive brief 21 days after the appealing party's opening brief.

47.     The parties cannot predict when the BIA will issue these materials. Appellate counsel must rearrange their workflow as soon as the transcript and briefing schedule arrive in the mail, and then review the record to prepare an opening brief.

48.     As a practical matter, the parties may not actually receive the BIA materials until much of the 21-day period to submit the opening brief has passed.

49.     The BIA does not follow the "mailbox rule" so the opening brief must be sent in advance of the 21-day deadline. The BIA does not allow for electronic filing of briefs.

50.     Accounting for the time it takes after issuance for appellants to receive the materials for appeal and the time it takes for BIA to receive the opening brief, individuals challenging

---

[2] The Sixth Circuit agreed with the Attorney General's narrow reading of the prior regulations. *See Hernandez-Serrano v. Barr*, 981 F.3d 459 (6th Cir. 2020).

immigration court orders typically have fewer than 14 days to prepare their appellate briefs.

51.     For those in detention, the time frame can be even more abbreviated due to delays in mail processing and other complications in immigration detention centers.

52.     The timeline presents serious challenges for all those in removal proceedings but has the harshest consequences for those who proceed *pro se* in immigration court and for those who are detained. Everyone in removal proceedings has a statutory right to counsel but not at the government's expense.

53.     Approximately 70% of those who appear in immigration court proceed *pro se*. Finding appellate counsel for BIA representation is challenging on the tight timeline following the BIA's issuance of materials for appeal.[3] Those who wish to obtain counsel will often have to copy and mail the paper transcripts, determine whether counsel has the resources at whatever arbitrary moment in time the materials arrive, and allow time for potential counsel to evaluate the merits of the case before taking it on. These steps can consume much of the appellate briefing timeline. If a person is lucky enough to secure counsel, the attorney is left with very little time to prepare and submit the opening brief.

54.     BIA procedures made allowances for these practicalities through an extension request procedure that is undone by the Rule. Prior to the Rule, the BIA would grant "an additional 21 days to file a brief regardless of the amount of time requested." BIA Practice Manual §§ 4.7(c)(i)(A), (B) (June 10, 2020).[4] And the parties could ask for extensions of up to 90 days. The prior regulations also permitted multiple extensions, which the BIA Practice Manual provided should be granted "only in rare circumstances." *Id.*

### 3.     Motions to Remand

55.     Under regulations and precedent in place before the Rule took effect, either party

---

[3] Noncitizens were *pro se* in 136,592 out of 191,633 (69.2%) cases initiated in FY 2020. Transactional Records Access Clearinghouse at Syracuse University ("TRAC"), State and County Details on Deportation Proceedings in Immigration Court, (last updated Nov. 2020), https://bit.ly/3s8wZnV (hereinafter "TRAC Representation Rates"). The percentage is even higher for detained noncitizens.

[4] Available at https://www.justice.gov/eoir/page/file/1284741/download.

was permitted to file a motion to remand if new and material evidence became available while an appeal was pending before the BIA. *See Matter of Coelho*, 20 I. & N. Dec. 464 (BIA 1992). For example, someone in removal proceedings might obtain evidence of eligibility for an alternative form of relief from USCIS or evidence of a significant change in country conditions or personal facts relevant to an asylum claim. In addition, a due process violation in the underlying proceedings, such as ineffective assistance of counsel, may come to light while an appeal is pending and necessitate a motion to remand. A motion to remand could also be based on a change in law.

56.     BIA procedures before the Rule permitted motions to remand during the pendency of an appeal. By filing a motion to remand, those in removal proceedings could present material, previously unavailable evidence before their order of removal became final and before the BIA was required to expend resources on the underlying appeal. *See id.* at 471. These procedures "guard against piecemeal appeals" and ensure that any reviewing Article III court "is presented with a full and complete record." *Narayan v. Ashcroft*, 384 F.3d 1065, 1068 (9th Cir. 2004).

57.     Motions to remand are a critical tool for those in removal proceedings to present evidence that could materially change the outcome of their cases.

### 4.     Motions to Reopen

58.     Motions to reopen are another longstanding procedure for protecting those subject to removal proceedings. *Dada v. Mukasey*, 554 U.S. 1, 12 (2008) (citing decisions on motions to reopen dating back to 1916-17). When the BIA was established in 1958, the Attorney General promulgated regulations allowing the BIA to reopen or reconsider a case "on its own motion" or "upon written motion" by either party, with no time or number limitations. *Dada*, 554 U.S. at 13 (citing 23 Fed. Reg. 9,115, 9,118-19 (Nov. 26, 1958), final rule codified at 8 C.F.R. § 3.2 (1959)).

59.     The Immigration Act of 1990 directed the Attorney General to issue regulations placing time and number limitations on motions to reopen and reconsider. *Dada*, 554 U.S. at 13 (citing Immigration Act of 1990, § 545(d)(1), 104 Stat. 5066). DOJ issued a rule in 1996 that imposed time and number limitations on motions to reopen and reconsider for both parties. 61 Fed. Reg. 18,900, 18,901 (Apr. 29, 1996).

60.     The 1996 rule retained immigration judges' and the BIA's authority to reopen cases *sua sponte*, without any time and number limitations. 8 C.F.R. §§ 3.2(a), 3.23(b)(1) (1996). That was an important feature of the rule; when the 1996 rule was proposed, a number of commenters advocated for a "good cause" exception to the time and number limitations on the parties, 61 Fed. Reg. at 18,901, and DOJ responded by emphasizing that *sua sponte* motions to reconsider effectively allow an exception for good cause. Specifically, DOJ stated: "section 3.2(a) of the rule provides a mechanism that allows the Board to reopen or reconsider *sua sponte* and provides a procedural vehicle for the consideration of cases with exceptional circumstances." *Id.* at 18,902.

61.     Congress then enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), which affords noncitizens the right to file one motion to reconsider within 30 days of a removal order, 8 U.S.C. § 1229a(c)(6), and one motion to reopen within 90 days of a removal order, 8 U.S.C. § 1229a(c)(7), with certain exceptions.[5]

62.     IIRIRA thus adopted the time and number limitations in the 1996 rule but "transform[ed] the motion to reopen from a regulatory procedure to a statutory form of relief" *Dada*, 554 U.S. at 14; *see also id.* at 18 (calling the motion to reopen an "important safeguard" to "ensure a proper and lawful disposition").

63.     The time and number limitations on motions to reopen can be equitably tolled. *See, e.g.*, *Socop-Gonzalez v. INS*, 272 F.3d 1176, 1187-88 (9th Cir. 2001) (en banc). Equitable tolling is available when fraud or other extraordinary circumstances prevent a noncitizen from filing and the noncitizen acts with due diligence. *Iturribarria v. INS*, 321 F.3d 889, 897–98 (9th Cir. 2003); *see also Mejia-Hernandez v. Holder*, 633 F.3d 818, 824 (9th Cir. 2011).

64.     In 1997, DOJ published regulations that exempted the government from the time and number limitations on motions to reopen and reconsider filed with the immigration courts but not the time and number limits in the BIA. 62 Fed. Reg. 10,312 (Mar. 6, 1997).

65.     Prior to the Rule, no other substantive changes to the statutory and regulatory

---

[5] There are exceptions or different deadlines for motions to reopen *in absentia* removal orders, motions to reopen to apply for asylum based on changed country conditions, and motions to reopen filed by certain battered spouses and children. 8 U.S.C. § 1229a(c)(7)(C).

scheme for motions to reopen and reconsider had been made since 1997.[6]

66.    At all times prior to the Rule, the BIA and the immigration courts have been free to reopen or reconsider a case *sua sponte* irrespective of time and number limitations on the parties.

67.    *Sua sponte* motions to reopen are essential to prevent injustice because they may be the sole mechanism for many to obtain relief from removal orders. In particular, lawful permanent residents with removal orders based on criminal convictions may have grounds to reopen their cases based on a change in law, post-conviction relief, or a pardon, which either eliminates the legal basis of removability or makes them eligible for discretionary relief from removal.

68.    Motions to reopen are also important for those who become eligible to adjust to lawful permanent resident status after receiving their removal orders. For example, a noncitizen who marries a U.S. citizen or whose U.S. citizen child reaches the age of 21 after a removal order is entered can be the beneficiary of an I-130 relative petition and may be eligible to adjust status on that basis, but only if proceedings are reopened. *See* 8 U.S.C. § 1255(a). A noncitizen survivor of battery or extreme cruelty by a U.S. citizen or lawful permanent resident spouse or relative can file an I-360 "self-petition" and become eligible to adjust status on that basis. 8 U.S.C. § 1154.

69.    In a variety of circumstances, a person who seeks reopening beyond the statutory deadline may not be able to make the showing of due diligence required for equitable tolling despite having acted reasonably—which leaves *sua sponte* reopening as the only way to rescind a removal order. *See, e.g.*, *Devitri v. Cronen*, 289 F. Supp. 3d 289, 291 (D. Mass. 2018) (finding that Indonesians had "reasonably relied on their [orders of supervision] in not filing motions to reopen earlier and had no reason to suspect that the Government would abruptly change its mind") *appeal docketed*, No. 18-1281 (1st Cir. Apr. 6, 2018); *Chhoeun v. Marin*, 306 F. Supp. 3d 1147, 1161 (C.D. Cal. 2018) (finding that Cambodians who "had been living undisturbed under supervised release for decades" had "reasonably concluded that removal, particularly imminent

---

[6] In 2003, the DOJ reorganized Title 8 of the Code of Federal Regulations after the functions of the former Immigration and Naturalization Service were transferred to the Department of Homeland Security pursuant to the Homeland Security Act of 2002. Accordingly, the regulations previously at 8 C.F.R. §§ 3.2 and 3.23 were moved to 8 C.F.R. §§ 1003.2 and 1003.23. 68 Fed. Reg. 10349 (Mar. 5, 2003).

removal, was unlikely"). A lack of access to affordable legal counsel prevents many individuals from obtaining legal advice and thereby establishing due diligence. For these and other reasons, many people with valid grounds for reopening their removal proceedings are often unable to meet statutory deadlines for their motions to reopen and rely on immigration judges or the BIA to grant a *sua sponte* motion to reopen in order to prevent manifest injustice.

**C.     Backlogs and a Barrage of New Rulemaking**

**1.     Backlogs in Immigration Court and the BIA**

70.     Fiscal Year 2021 started with the largest immigration court backlog on record.[7] The median time from a notice of appeal to a BIA decision is approximately 323 days and, as a result of COVID-19-related delays, it has become increasingly common for appeals to remain pending for 335 days or longer. *See* 85 Fed. Reg. at 81,619 (acknowledging the "323-day median case appeal time period.").

71.     The backlog has grown under the Trump Administration, which has not implemented recommendations from the independent consulting firm EOIR hired to help it improve efficiency.

72.     One of the most important changes the consultants recommended was that BIA implement an electronic case management system.[8] The BIA has not done so.

73.     The BIA also has not implemented other recommendations to improve efficiency.[9] For example, the consultants recommended that the BIA work with DHS "to administratively close cases awaiting adjudication in other agencies or courts" as a way to improve EOIR's

---

[7] TRAC, *FY 2021 Begins with Largest Immigration Court Backlog on Record*, (Nov. 24, 2020), https://bit.ly/35c4MTD.

[8] Public Comment of Catholic Legal Immigration Network, Inc. at 5–6 (Sept. 25, 2020), https://bit.ly/3pIWhXP ("CLINIC Comment"); EOIR, Legal Case Study Summary Report, Booz Allen Hamilton at 26 (Apr. 6, 2017), https://bit.ly/35td6yo ("Booz Allen Hamilton Report").

[9] U.S. Gov't Accountability Off., GAO-18-469T, Testimony Before the Subcommittee on Border Security and Immigration, Committee on the Judiciary, *Immigration Courts:  Observations on Restructuring Options and Actions Needed to Address Long-Standing Management Challenges* at 9 (Apr. 18, 2018), https://bit.ly/3rQDJqm ("EOIR could take several actions to address long-standing management and operational challenges and reduce the case backlog. . . . Overall, EOIR has fully implemented 1 recommendation" out of eleven total).

processes.[10] Instead, EOIR has tried to stop the practice of administrative closure.

74.     Former immigration judges have commented that these and other changes at EOIR have only exacerbated the backlog. They have reported that "the number of appeals received by, and pending before, the BIA" has increased as a "result of prior actions by the Department." The agency's policy changes have caused much of the "crushing backlogs" the regulations purport to alleviate.[11]

### 2.     A Barrage of Rulemaking

75.     The Administration launched a barrage of rules in the second half of 2020, all of which were aimed at making it more difficult for noncitizens to obtain immigration relief. Many of these rules have been partially or completely enjoined by the federal courts because they violate the APA.

76.     In June 2020, DHS issued two final rules—*Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applicants*, 85 Fed. Reg. 37,502 (June 22, 2020) ("EAD Rule I") and *Asylum Application, Interview, and Employment Authorization for Applicants*, 85 Fed. Reg. 38,532 (June 26, 2020) ("EAD Rule II") (collectively, "EAD Rules")—that significantly increase the amount of time that asylum applicants must wait to obtain employment authorization and in some cases make it impossible to obtain or maintain such authorization. The rules took effect for a brief period of time in August 2020 before being partially enjoined. *Casa de Md., Inc. v. Wolf*, --- F. Supp. 3d ---, 2020 WL 5500165 (D. Md. Sept. 11, 2020).

77.     On August 3, 2020, DHS issued a final rule dramatically increasing fees for applicants for essential immigration benefits, including naturalization and asylum. *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 85 Fed. Reg. 46,788 (Aug. 3, 2020) ("Fee Increase Rule"). In September 2020, Judge White in the Northern District of California enjoined the fee increases on

---

[10] Booz Allen Hamilton Report at 26.

[11] Public Comment of Former Round Table of Immigration Judges at 2-3 (Sept. 24, 2020), http://bit.ly/3oFfRE8.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

grounds that plaintiffs were likely to prevail on their claims that Chad Wolf lacked authority to serve as Acting Secretary of DHS, and that the fee increase was arbitrary and capricious. *Immigrant Legal Res. Ctr. v. Wolf*, --- F. Supp. 3d ---, 2020 WL 5798269, at \*1 (N.D. Cal. Sept. 29, 2020). About a week later, the United States District Court for the District of Columbia reached a similar conclusion. *N.W. Immigr. Rights Project v. U.S. Citizenship & Immigr. Servs.*, --- F. Supp. 3d ---, 2020 WL 5995206, at \*24 (D.D.C. Oct. 8, 2020).

78.     On October 21, 2020, DHS and DOJ issued a final rule imposing a slew of new categorical bars on asylum applicants. *Procedures for Asylum and Bars to Asylum Eligibility*, 85 Fed. Reg. 67,202 (Oct. 21, 2020) ("Asylum Eligibility Rule"). On November 19, 2020, the day before the rule was scheduled to take effect, a court in this district issued a temporary restraining order enjoining implementation of the rule nationwide on grounds that it was contrary to law, arbitrary and capricious, and passed in violation of the APA. *Pangea Legal Servs. v. U.S. Dept. of Homeland Sec.*, No. 20-cv-07721-SI, 2020 WL 6802474, at \*2 (N.D. Cal. Nov. 19, 2020) ("*Pangea I*"), *appeal docketed*, No. 20-17490 (9th Cir. Dec. 28, 2020). On November 24, 2020, the Court converted the temporary restraining order to a preliminary injunction. *Id,* 20-CV-07721-SI, (N.D. Cal. Nov. 24, 2020), ECF No. 74.

79.     On December 11, 2020, DHS and DOJ issued a final rule that transforms the asylum process and effectively prevents most applicants from establishing claims for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), *Procedure for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review,* 85 Fed. Reg. 80,274 (Dec. 11, 2020) ("Omnibus Asylum Rule"). The rule was scheduled to take effect on January 11, 2021 but was enjoined by a court in this district. *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 20-CV-09253-JD, 2021 WL 75756, at \*1 (N.D. Cal. Jan. 8, 2021) ("*Pangea II*").

80.     On December 16, 2020, DOJ issued a final rule to amend the regulations for adjudication of applications for asylum, withholding of removal, and protection under CAT, *Procedures for Asylum and Withholding of Removal*, 85 Fed. Reg. 59,692 (Sept. 23, 2020) ("Asylum Procedures Rule"). Among other things, the Asylum Procedures Rule establishes a 15-day filing deadline for asylum applicants in asylum-and-withholding-only proceedings. 85 Fed.

Reg. 81,698 (Dec. 16, 2020). The rule requires immigration judges to reject an asylum application as incomplete if it does not include a response to each of the required questions contained in the asylum application form or is unaccompanied by the required materials. 85 Fed. Reg. at 81,699. The rule was scheduled to take effect on January 15, 2021 but was enjoined by a court in the District of Columbia.[12]

81.    On December 17, 2020, DOJ and DHS finalized a prior interim rule that barred access to asylum for those who do not first seek asylum and receive a final adjudication in another country while en route to the United States. *See Asylum Eligibility and Procedural Modifications,* 85 Fed. Reg. 82,260 (Dec. 17, 2020) ("Transit Ban Rule"). Iterations of this rule have been struck down by the federal courts. *See Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 57 (D.D.C. 2020); *E. Bay Sanctuary Covenant v. Barr*, 964 F. 3d 832 (9th Cir. 2020); *Al Otro Lado v. Wolf*, 952 F.3d 999, 1003 (9th Cir. 2020); *see also Al Otro Lado v. Gaynor*, No. 17-cv-02366-BAS-KSC, 2021 WL 150987, at *1 (S.D. Cal. Jan. 18, 2021) (temporarily restraining government from applying the Transit Ban Rule to provisional class members).

82.    On December 18, 2020, EOIR issued a final rule, *Fee Review*. 85 Fed. Reg. 82,750 (Dec. 18, 2020) ("EOIR Fee Rule"). The rule would drastically increase EOIR fees. For example, the cost for Form EOIR-26, Notice of Appeal from a Decision of an Immigration Judge, would increase from $110 to $975. Although the rule was scheduled to take effect on January 19, 2021, it too was enjoined by a federal court. *See Catholic Legal Immigr. Network v. Exec. Office for Immigr. Review*, Case No. 1:20-cv-03812-APM (D.D.C. Jan. 18, 2021), ECF No. 34.

83.    On December 23, 2020, DHS and DOJ finalized a rule than amends regulations to allow adjudicators to deny asylum and applications for withholding of removal on "security" grounds if the applicant exhibits a symptom of a contagious disease or is coming from a region where the disease is prevalent. *Security Bars and Processing*, 85 Fed. Reg. 84,160 (Dec. 23, 2020). ("Security Bar Rule"). The rule would amend regulations to allow adjudicators to deny

---

[12] *Nat'l Immigrant Justice Ctr.v. Exec. Office for Immigr. Review*, Case No. 1:21-cv-00056-RBW, Order Granting Mot. for Temporary Restraining Order, Prelim. Inj. & Stay (D.D.C. Jan. 14, 2021), ECF No. 11.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

asylum and withholding applications on "security" grounds if the applicant exhibits a symptom of a contagious disease (such as COVID) or coming from a region where the disease is prevalent. Thirty days were allowed for public comment. *Id.* That rule is scheduled to take effect on January 22, 2021. 85 Fed. Reg. 84,160 (Dec. 23, 2020).

84.     In addition to the many rules finalized in late 2020, DOJ proposed two new rules that directly intersect with the one at issue in this case.

85.     On November 27, 2020, DOJ issued a notice of proposed rulemaking to restrict the availability of continuances in immigration court. *Good Cause for a Continuance in Immigration Proceedings,* 85 Fed. Reg. 75,925 (Nov. 27, 2020) ("Continuance NPRM").

86.     Also on November 27, 2020, DOJ issued a notice of proposed rulemaking to significantly heighten the standards and burdens of proof for adjudicating statutory motions to reopen, including claims regarding ineffective assistance of counsel. *Motion to Reopen and Reconsider; Effect of Departure; Stay of Removal*, 85 Fed. Reg. 75,942 (Nov. 27, 2020) ("Motion to Reopen NPRM").

87.     DOJ issued these NPRMs after the comment period for the Rule at issue in this case had already closed.

## II.     The Rule

### A.     Notice of Proposed Rulemaking

88.     Defendants issued the Notice of Proposed Rulemaking titled "*Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure*" (the "Proposed Rule") on August 26, 2020, as part of the barrage of rulemaking that took place in 2020. 85 Fed. Reg. 52,491 (Aug. 26, 2020).

89.     The Proposed Rule was signed by then-Attorney General William Barr. It proposed numerous changes to immigration court and BIA procedures, each of which operates against those seeking to defend against removal.

90.     These changes included many that are contrary to the way most courts function. For example, the rule proposed requiring simultaneous briefing on appeal, limiting briefing extensions on appeal, authorizing the BIA to issue dispositive decisions, assigning authority to the EOIR

Director to adjudicate cases, limiting the BIA's authority to grant motions to remand for consideration of new evidence, allowing the BIA to limit the scope of remand, and limiting immigration judges' and the BIA's ability to administratively close cases. 85 Fed. Reg. at 52,491.

91.     The Proposed Rule also made significant changes to motions to reopen and reconsider, most notably eliminating the immigration courts' and BIA's longstanding authority to reopen or reconsider cases *sua sponte*, except to correct typographical errors or defective service. 85 Fed. Reg. at 52,505. The Proposed Rule allowed the filing of one motion to reopen or reconsider outside the time and number limitations where a change in law or fact renders the noncitizen no longer removable and the noncitizen has exercised diligence in pursuing the motion. *Id.* at 52,506. Such a motion could be granted only by a three-member panel of the BIA. *Id.* Finally, the Proposed Rule exempted DHS from time and number limitations on motions to reopen and reconsider filed with the BIA. *Id.*

92.     Although the Rule was issued around the same time as numerous other rules that effect the same population, and in the midst of the COVID-19 pandemic, the Proposed Rule allowed only a 30-day public comment period. 85 Fed. Reg. at 52,491.[13]

93.     Defendants acknowledged that the Proposed Rule was a "significant regulatory action" under Executive Order 12866, *see* 85 Fed. Reg. at 52,509, but did not explain why only 30 days were provided instead of the default 60-day comment period. *See* Exec. Order No. 12866, §6(a), 58 Fed. Reg. 51,735, 51,740 (Oct. 4, 1993) ("[E]ach agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should

---

[13] This stands in stark contrast with the typical practice of allowing 60 days for comment on significant regulatory actions, *see* Exec. Order 12866, 58 Fed. Reg. at 51,740 ("[I]n most cases [rulemaking] should include a comment period of not less than 60 days."), and also with the decisions of other agencies to extend the period for public participation during the COVID-19 pandemic. *See, e.g.*, Bureau of Consumer Financial Protection, *Debt Collection Practices (Regulation F); Extension of Comment Period*, 85 Fed. Reg. 30,890 (May 21, 2020) (agreeing that "the pandemic makes it difficult to respond to the SNPRM thoroughly" and providing an additional 90 days to comment on a proposal "in light of the challenges posed by the COVID-19 pandemic"). Meanwhile, numerous rules seeking merely an extension of forms without change have been allowed a 60-day comment period. *See Agency Information Collection Activities; Extension Without Change, of a Currently Approved Collection: Petition for U Nonimmigrant Status*, 85 Fed. Reg. 58,381 (Sept. 18, 2020); *Agency Information Collection Activities; Extension, Without Change, of a Currently Approved Collection: Request for the Return of Original Documents*, 85 Fed. Reg. 58,380 (Sept. 18, 2020) (same).

include a comment period of not less than 60 days."); *also* Exec. Order No. 13563, 76 Fed. Reg. 3,821, 3,822 (Jan. 21, 2011) (reiterating that comment periods should "generally be at least 60 days.").

94.    1,284 individuals and organizations including Plaintiffs ILRC, Tahirih, and RAICES, submitted comments on the Proposed Rule, mostly expressing opposition to the rule. Many of these comments emphasized that the short comment period prevented them from submitting a complete response to the Proposed Rule.

95.    In particular, the staggered rulemaking process made it difficult for commenters to address the interplay between and impact of rules. And the sheer number of rules promulgated in a relatively short time period made it impossible for interested parties, including nonprofit organizations like Plaintiffs, to dedicate sufficient resources to comment comprehensively on the rules. Some small entities, like Plaintiff Centro Legal, were unable to comment on the Rule during the 30-day comment period.

**B.    The Final Rule**

96.    The Final Rule was published in the Federal Register on December 16, 2020. 85 Fed. Reg. 81,588 (Dec. 16, 2020). The Rule was one of six anti-immigrant rules finalized between December 11 and December 23, 2020.[14] All six were given 30-day effective dates, leaving immigrants and those who represent them struggling to respond to sweeping changes over the holiday business closures and in the midst of the surging COVID-19 pandemic.

97.    The Rule purported to explain why Defendants rejected commenters' requests to extend the comment period, stating that "the COVID-19 pandemic has no effect on the sufficiency of the 30-day comment period" because employers have adopted telework policies and childcare would remain an issue "regardless of the length of the comment period." *Id*. at 81,643. That response ignored comments that office closures had created challenges for legal service providers who must meet with clients and handle physical documents; that community organizations were unexpectedly assisting clients experiencing food and housing insecurity due to the pandemic; and

---

[14] Omnibus Asylum Rule, Asylum Procedures Rule, Transit Ban Rule, EOIR Fee Rule, Security Bar Rule. *See supra*, ¶¶ 79-83.

that staff had caregiving responsibilities for family members who had contracted COVID-19 and for children whose schools were closed.[15]

98.   The Rule summarily rejected many other comments from the public and included virtually no changes from the Proposed Rule.

99.   In addition to failing to meaningfully respond to comments, the Rule did not analyze how the Rule would affect small entities that provide legal services to immigrants, and whose missions and operations will be upended by the Rule's radical changes to EOIR procedures. Without wrestling with issues commenters identified, Defendants concluded that the Rule "would not have a significant economic impact on a substantial number of small entities" and "does not limit the fees [representatives] may charge or the number of cases a representative may ethically accept under the rules of professional responsibility." *Id*. at 81,646.

100.   The Rule also did not provide a rational response to comments explaining that the Rule will exacerbate existing problems in the immigration courts and the BIA, cause the backlog to increase, and impose practically insurmountable barriers to those seeking to defend against removal. The Rule also did not articulate a rational connection between the changes it imposes and its purported justifications. For example, it ignored data back to 1986 showing that administrative closure has helped reduce the backlog in immigration court, and that EOIR had misrepresented data it relied on in the Rule.[16]

101.   The Rule took effect on January 15, 2021.

---

[15] Public Comment of Brooklyn Defender Services at 2 (Sept. 25, 2020), https://tinyurl.com/y2nxssh2; Immigrant Law Center of Minnesota at 2 (Sept. 25, 2020), https://tinyurl.com/y3akqtxc; Public Comment of Community Legal Services in East Palo Alto at 2 (Sept. 24, 2020), https://tinyurl.com/yyzsrmem.

[16] *See* TRAC, Report: The Life and Death of Administrative Closure (Sept. 10, 2020), https://tinyurl.com/y2u2kn8f; *cited in* Public Comment of DePaul Asylum and Immigration Law Clinic (Sept. 24, 2020), https://tinyurl.com/yyg3lc4b; Round Table of Immigration Judges (Sept. 24, 2020), http://bit.ly/3oFfRE8; Public Comment of The Legal Aid Society(Sept. 24, 2020), https://tinyurl.com/y6cnkh2k; Public Comment of Tahirih Justice Center ("Tahirih Comment") (Sept. 25, 2020), https://tinyurl.com/y6qy229m.

### III.   The Rule Violates the Procedural and Substantive Requirements of the APA.

#### A.   Defendants' Rulemaking Process Was Fatally Flawed

##### 1.   The 30-Day Comment Period Was Unreasonably Short

102.   Without explanation, Defendants issued the Proposed Rule with just 30 days for comments. Such a short comment period would have been inadequate in any circumstances given the complexity of the scheme the Rule alters. But it was particularly inadequate at the time the Rule was proposed in light of the many other intersecting rules proposed around the same time and the unique challenges that affected parties faced during the COVID-19 pandemic.

103.   Although numerous commenters raised concerns about the short comment period, Defendants ignored requests for more time. Defendants offered no meaningful explanation for imposing such a short comment period, even though many other agencies extended deadlines in light of the pandemic.

104.   Courts have observed that 60 or "90 days is the 'usual' amount of time allotted for a comment period." *Becerra v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1176-77 (N.D. Cal. 2019) (quoting *Prometheus Radio Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011)); *accord Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) ("[A] thirty-day period is, in the Administrative Conference's view, 'an inadequate time to allow people to respond to proposals that are complex or based on scientific or technical data.' The Administrative Conference itself thus suggests a sixty-day period as 'a more reasonable *minimum* time for comment.'" (footnotes omitted)); *Pangea I*, 2020 WL 6802474, at *19-20 (enjoining immigration rule due to, *inter alia*, providing a 30-day comment period).

105.   Executive Order 13563 makes clear that "[t]o the extent feasible and permitted by law, each agency *shall* afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days." Exec. Order 13563, 76 Fed. Reg. at 3,821-22 (emphasis added); *see also* Exec. Order 12866, 58 Fed. Reg. at 51,740 ("[I]n most cases [rulemaking] should include a comment period of not less than 60 days.").

106.   Defendants acknowledged that the Rule is a "significant regulatory action" that must

be "consistent with the principles of Executive Orders 12866 and 13563." 85 Fed. Reg. at 81,643. In light of that fact, a 60- or even 90-day comment period would have been the minimum appropriate here. Instead, Defendants allowed just 30 days for comments on the proposed Rule.

107.   The comment period was wholly inadequate under the circumstances. The Rule is a complex rule that makes major changes to a critical part of the immigration system. It was also part of a "staggered" rulemaking process "in which [DOJ and DHS] published this NPRM and several other related proposed rules." *Pangea I*, 2020 WL 6802474, at *22.

108.   Defendants also issued the Rule in the midst of a global pandemic sweeping the country, endangering lives, and disrupting life and work schedules. Other agencies have acknowledged the unique challenges of operating during the pandemic and extended comment periods under the circumstances.[17]

109.   Defendants did not articulate a reasoned explanation for providing such a brief comment period. Defendants did not suggest that a 60-day comment period was infeasible for any reason. They did not even explain why a 30-day comment period was preferable.

110.   Instead, Defendants offered only weak rebuttals of commenters arguments.

111.   For example, Defendants asserted that "commenters did not suggest or indicate what additional issues the comment period precluded them from addressing." 85 Fed. Reg. at 81,642. This is patently false. Commenters identified issues they would have addressed given more time, including the interaction between this Rule and the Asylum Procedures Rules, which was issued just two days before the close of this Rule's comment period.[18]

112.   Defendants also pointed to 2002 rulemaking that allowed a 30-day period was a rule that amended certain BIA procedures. *See* 85 Fed. Reg. at 81,642 & n.72 (citing 67 Fed. Reg. at

---

[17] *See, e.g.*, Bureau of Consumer Financial Protection, *Debt Collection Practices (Regulation F); Extension of Comment Period*, 85 Fed. Reg. 30,890 (May 21, 2020) (agreeing that "the pandemic makes it difficult to respond to the SNPRM thoroughly" and providing an additional 90 days to comment on a proposal "in light of the challenges posed by the COVID-19 pandemic").

[18] *See, e.g.,* Public Comment of AILA at 2-3 (Sept. 25, 2020), http://bit.ly/3pNe14r ("AILA Comment"); Reichlin-Melnick Comment n.5, at 2-4 (Sept. 25, 2020), https://tinyurl.com/yxzpzkxj; Public Comment of Center for Gender & Refugee Studies at 4 (Sept. 25, 2020), http://bit.ly/3s6c2tW.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

54,878). That single example from nearly twenty years ago is irrelevant and an outlier set against more recent examples in which commenters were given substantially more time. And in all events, Defendants failed to defend their decision making with respect to this Rule, taking into consideration their staggered rulemaking and a global pandemic.

113.   Commenters explain that the COVID-19 pandemic made commenting more difficult by, for example disrupting workplaces, increasing childcare duties, and making it harder to communicate with clients who might have relevant information. Defendants' response was wholly inadequate. They asserted that allowing a 60-day comment period in light of COVID-19, "would effectively preclude rulemaking by the Department for the duration of the COVID-19 outbreak" because "individual personal circumstances" that make commenting a challenge are present for "every rulemaking." 85 Fed. Reg. at 81,643. But allowing more time for comments is not the same thing as saying that rulemaking must cease. Defendants' failure to seriously consider the challenges commenters faced during the pandemic denied the public a meaningful opportunity to respond to the proposal.

## 2.     Defendants' Staggered Rulemaking Denied the Public A Meaningful Opportunity to Comment and Renders the Rule Arbitrary and Capricious

114.   The Rule was issued as part of an improper staggered rulemaking process in which various rules affecting people subject to immigration court and BIA proceedings were proposed separately at different times, preventing the public from understanding and commenting on the full implications of changes to the regulatory landscape.

115.   In particular Defendants proposed the Asylum Procedures Rule just two days before the comment period for this Rule ended, leaving commenters without time to address issue.

116.   Defendants also proposed two closely-related rules—the Motion to Reopen NPRM and the Continuance NPRM—after the comment period for this Rule closed.[19] These two NPRMs

---

[19] DHS also issued a proposed rule affecting individuals impacted by the instant Rule during this period. *See Employment Authorization for Certain Classes of Aliens With Final Orders of Removal*, 85 Fed. Reg. 74,196 (Nov. 19, 2020) (eliminating work authorization for individuals with final orders).

exacerbate the detrimental impact of this Rule on noncitizens' ability to present defenses to removal. Because these NPRMs were published in November 2020, commenters were deprived of the ability to discuss the interplay of the rules and the full effect of *this* Rule. And Defendants did not consider this interplay when they finalized the Rule at issue in this case.

117.   In particular, Defendants' Motion to Reopen NPRM significantly heightens the standards and burdens of proof for adjudicating statutory motions to reopen, including claims regarding ineffective assistance of counsel. *See* 85 Fed. Reg. 75,942 (Nov. 27, 2020). Among other things, it prohibits immigration judges from receiving evidence outside the scope of relief for which reopening was granted, *see id.* at 75,953, which compounds the harms caused by the instant Rule because it eviscerates an immigration judge's ability to consider new evidence. The Motion to Reopen NPRM also proposes significant hurdles to obtaining a stay of removal, as well as consequences for departing the United States, which will exacerbate the harm caused by many of the changes in this Rule.

118.   Defendants' other proposed rule, the Continuance NPRM, further restricts continuances before the immigration court. *See* 85 Fed. Reg. 75,925 (Nov. 27, 2020). It therefore makes seeking parallel relief before EOIR and USCIS or state courts even more difficult, adding to the erosion of procedural protections at issue in this Rule. The Continuance NPRM is also inconsistent with Defendants' attempt to justify the Rule at issue in this case. Defendants specifically relied on the existence of continuances to justify the elimination of remedies like administrative closure and *sua sponte* reopening. *See, e.g.*, 85 Fed. Reg. at 81,647.

119.   Defendants' rulemaking process not only denied the public an opportunity to comment on the interplay of these rules, Defendants failed to consider the cumulative effect of all the rules at the same time.

120.   For example, Defendants failed to consider the interplay of this Rule and the Omnibus Asylum Rule, which would alter the substance and procedure of asylum adjudications. *See* 85 Fed. Reg. 80,274. Among other things, the Omnibus Asylum Rule curtails the discretion of an immigration judge or the BIA to consider motions to reopen even based on changed country conditions, yet the Rule at issue in this case repeatedly rests on the availability of such motions to

justify limiting other procedural remedies like *sua sponte* reopening and motions to remand. *See, e.g.*, 85 Fed. Reg. at 81,629, 81,632, 81,634. Defendants did not consider the interactions between these rules.

121. Defendants also failed to consider the interplay of this Rule and the Asylum Procedures Rule, which imposes a strict 15-day timeline for filing an asylum application for those in asylum-only and withholding-only proceedings. *See* 85 Fed. Reg. at 81,698. Under the Asylum Procedures Rule, immigration judges will deem individuals who fail to file asylum applications within 15 days to have waived the opportunity to submit an application. *Id.* Because such individuals are to have their cases "returned to DHS," it is unclear what appellate rights they will have. For some, the availability of *sua sponte* reopening by an immigration judge will become all the more critical to prevent miscarriages of justice. The Asylum Procedures Rule also allows immigration judges to submit evidence in proceedings, which has profound implications for "undisputed" facts the BIA may now "administratively notice" under the instant Rule. Nevertheless, Defendants did not consider the interactions between these rules.

122. The EOIR Fee Rule increases the fee from $110 to $975 for BIA appeals, and from $110 to $895 for BIA motions to reopen or reconsider. *See* 85 Fed. Reg. at 82,750. Defendants acknowledge the EOIR Fee Rule but refused to consider its implications because it could be enjoined. *See* 85 Fed. Reg. at 81,594. In other words, Defendants did not meaningfully consider the deterrent effect of increased fees before overhauling the EOIR system, nor the burden of seeking fee waivers or other sources of funding for appeals while also meeting an expedited timeframe for briefing. Nor did Defendants consider the harm in eliminating the BIA's self-certification and *sua sponte* reopening authority, which are often used to accept appeals and motions that are rejected after denial of a fee waiver.

123. Two other final rules issued in December 2020 also intersect with the Rule at issue in this case. The Transit Ban Rule, 85 Fed. Reg. at 82,260, bars individuals from seeking asylum if they transited through another country and did not seek and receive a denial of protection in that

country. [20] The Security Bars Rule, 85 Fed. Reg. 84,160, bars access to the United States, the asylum process, and the immigration courts in the name of national security and public health, but is so sweeping that nearly anyone who traveled through a country where COVID-19 is prevalent or manifests minor symptoms could be barred from immigration relief, *id.* at 84,196. Even if those rules are enjoined, people subject to them will not be able to seek remand of a pending appeal at the BIA to address the change in law, due to changes made by the Rule at issue here.

124.   Defendants' failure to consider the implications of these rules constitutes arbitrary and capricious rulemaking, and it also denied the public a meaningful opportunity to comment on the Rule. *Immigrant Legal Res. Ctr.*, 2020 WL 5798269, at *14 (preliminarily enjoining DHS-issued rule under APA in part because DHS "fail[ed] to consider the combined impact" of another DHS-issued rule); *see also Casa de Md., Inc.*, 2020 WL 5500165, at *26 (preliminarily enjoining DHS-issued rule under APA in part because DHS staggered rulemaking, precluding the public from considering the cumulative impact of the rules).

**B.      Director McHenry Issued the Rule Without Valid Authority**

125.   The INA provides that "[t]he Attorney General shall establish such regulations, . . . delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" his authority under the INA. 8 U.S.C. § 1103(g)(2). The EOIR "shall be subject to the direction and regulation of the Attorney General" as prescribed by § 1103(g). 6 U.S.C. § 521(a).

126.   By way of federal regulation, the Attorney General has delegated limited authority to EOIR. *See* 8 C.F.R. § 1003.1. These regulations also delineate the authority of the Director of EOIR. *See id.* § 1003.1(b). The Director has the authority to "[i]ssue operational instructions and

---

[20] A court in the District of Columbia vacated the interim final rule that preceded that rule because it violates the APA, *Cap. Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 57 (D.D.C. 2020), *appeals docketed*, Nos. 20-5271 & 20-5273 (D.C.Cir. Aug. 31, 2020), and the Ninth Circuit has also signaled its view that the same interim final rule violates the INA and the APA, *see East Bay Sanctuary Covenant*, 964 F. 3d 832. As to the Security Bar Rule, a D.C. District Court has recently concluded that COVID-19 cannot be the basis for expedient deportation of children. *See P.J.E.S. v. Wolf*, -- F. Supp. 3d --,, 2020 WL 6770508 (D.D.C. Nov. 18, 2020), *appeal docketed*, No. 20-5357 (D.C. Cir. Nov. 30, 2020). Though *P.J.E.S.* does not directly involve the Security Bar Rule, the decision signals a judicial rejection of its underlying approach and reasoning.

policy, including procedural instructions regarding the implementation of new statutory or regulatory authorities[.]" *Id.* § 1003.1(b)(i). But the regulation's text distinguishes "operational instructions," "policy," and "procedural instructions" from "new statutory or regulatory authorities," and nowhere does the regulation authorize the Director to ratify "new regulatory authorities." *Id.* Instead, that authority remains with the Attorney General. *See* 6 U.S.C. § 521(a).

127.   The Final Rule asserts that the Director of EOIR had authority to issue the Rule under Attorney General Order Number 4910-2020. *See* 85 Fed. Reg. at 81,650–51. At the time of the Proposed Rule, the public could not have commented on the propriety of Order 4910-2020 because the Proposed Rule indicated the Attorney General would issue the Rule, and the Order was not signed until November 17, 2020.

128.   The Order purportedly delegates "the authority to issue regulations related to immigration matters within the jurisdiction of the [EOIR]" to the Director of EOIR "[p]ursuant to the authority vested in the Attorney General by law, including 28 U.S.C. §§ 509 and 510."[21] But 28 U.S.C. §§ 509 and 510 are general delegation provisions and do not provide the specific statutory authority for the Attorney General to delegate rulemaking authority under the INA to the EOIR Director. *See N.S. v. Hughes*, No. 1:20-cv-101-RCL, 2020 WL 4260739, at *5 (D.D.C. July 24, 2020).

129.   The Attorney General may only delegate the specific authority necessary to promulgate the Rule under 8 U.S.C. § 1103(g)(2). *See id.* This is because the INA is a "comprehensive federal statutory scheme for regulation of immigration and naturalization," *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 587 (2011), and the Attorney General's power to delegate rulemaking authority within the Department pursuant to §§ 509 and 510 "does not apply where Congress has specifically and separately allocated enforcement authority over a certain action or set of actions." *N.S.*, 2020 WL 4260739, at *5 (citing *United States v. Giordano*, 416 U.S. 505, 513 (1974)).

---

[21] *See* Attorney General Order No. 4910-2020, *Nat'l Immigrant Justice Ctr., et al. v. The Executive Office for Immigration Review, et al.*, No. 1:21-cv-00056-RBW (D.D.C. Jan. 13, 2021), ECF No. 10-1.

130.   The Attorney General may therefore *only* delegate authority to the Director of EOIR under 8 U.S.C. § 1103(g). Order Number 4910-2020 does not refer to that provision, and the more general delegation in the Order does not suffice under fundamental principles of administrative law. *See SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943); *see also N.S.*, 2020 WL 4260739, at *6.

131.   Because Director McHenry was without statutory or regulatory authority to issue the Rule, and because the Rule fails to provide a valid reason why Director McHenry had the authority to issue the Rule, the issuance of the Rule was *ultra vires* "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and not in accordance with law, *id.* § 706(2)(A). As such, the Rule in its entirety should be set aside.

132.   The Rule also suffers from the additional problem that the Proposed Rule did not disclose that the EOIR Director would sign the Rule, so the public was denied a meaningful opportunity to comment on the propriety of his actions. In particular, they were denied an opportunity to comment on the anomalous and dangerous circumstances of the Rule, through which Director McHenry purported to use power delegated to him generally to further delegate specific adjudicatory authority from the Attorney General to himself. The Rule also violates the APA for this reason. *See* 5 U.S.C. § 553(c); 5 U.S.C. § 706(2)(D).

## C.    The Rule Effects Numerous Procedural Changes That Are Contrary to Law and Arbitrary and Capricious

### 1.    Elimination of Administrative Closure

133.   For decades, immigration judges and the BIA have used administrative closure to defer cases while respondents await USCIS decisions on applications that are likely to provide relief from removal. Because the statutory scheme established by Congress requires USCIS to adjudicate certain petitions, immigration judges and the BIA have used administrative closure to allow noncitizens to pursue relief made available to them by statute. The Rule amends the regulations at 8 C.F.R. §§ 1003.1(d)(1)(ii) and 1003.10(b) to generally prohibit immigration judges or the BIA from exercising this authority.

134.   By eliminating administrative closure as a procedural tool, Defendants failed to consider an "important aspect of the problem." *Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463

31

U.S. 29, 43 (1983). Specifically, Defendants failed to reckon with the fact—highlighted in numerous comments—that eliminating administrative closure will lead to the deportation of noncitizens who have meritorious claims for relief. *Meza Morales*, 973 F.3d at 665 ("[C]ases must be disposed of fairly, and granting a noncitizen the opportunity to pursue relief to which she is entitled may be appropriate and necessary for a fair disposition.")[22]

135.    Particularly when combined with the elimination of motions to remand for new evidence and *sua sponte* motions to reopen, elimination of administrative closure will make it impossible for many noncitizens to pursue various forms of relief that Congress made available by statute, depriving them of an opportunity to be heard on such remedies. Defendants failed to even acknowledge that a major purpose of administrative closure is to enable noncitizens to pursue relief to which they are entitled (*e.g.*, U visas, VAWA self-petitions, and provisional unlawful presence waivers). Likewise, the Rule failed to consider the combined effect of the elimination of administrative closure and the other changes in the Rule. Restricting motions to reopen, motions to remand, and the BIA's authority to act *sua sponte* makes it more difficult and often impossible to alter an order of removal or other immigration judge decision when a noncitizen subsequently obtains relief from USCIS or another agency.

136.    The Rule will thus lead to removal orders and actual removal of noncitizens who are entitled to immigration benefits, subjecting them to violence or other hardship before they are granted relief, or in some cases preventing them from obtaining the relief altogether.

137.    Because prohibiting administrative closure is likely to result in some noncitizens being removed, even though they would have been able to obtain relief, the risk of unfairness and injustice is high, yet Defendants discounted this important consideration altogether. In fact, in response to comments concerning data showing that noncitizens who obtain administrative closure have obtained lawful status, the Rule concluded that such data was "ultimately of little relevance

---

[22] *See* Tahirih Comment at 8-9 (describing devastating effects of the change on survivors of violence, including renewed threats to their lives upon deportation). *See also* Public Comment of the Mayor of Minneapolis at 1-2 (Sept. 25, 2020) (noting that deportation can be a death sentence) https://bit.ly/38Y6Ssx; Public Comment of the National Network to End Domestic Violence at 3-4 (Sept. 25, 2020) https://bit.ly/3bSsUP7 (describing the horrific and life-threatening situations survivors of domestic violence face upon deportation).

to the rule." 85 Fed. Reg. at 81,648.

138.   Although the Rule notes that commenters raised concerns about how the elimination of administrative closure would result in "unfairly harsh consequences" for noncitizens pursuing relief through USCIS, 85 Fed. Reg. at 81,597, Defendants did not adequately respond to those comments. Defendants merely concluded that "[w]ith EOIR's pending caseload reaching record highs, EOIR simply cannot allow indefinite delays that prolong adjudication any longer than necessary for immigration judges to decide the issues squarely before them. . . . [T]he Department does not believe that administrative closure is a proper tool for efficiently adjudicating proceedings . . . " *Id.* at 81,598 (footnote omitted).

139.   Defendants' justification for prohibiting administrative closure is arbitrary and capricious. Defendants purportedly base the elimination of administrative closure on a belief that administrative closure decreases the efficiency of the immigration courts, conflicts with the immigration courts' duty to resolve cases in a timely fashion, and is not authorized by, or even conflicts with, existing regulations. 85 Fed. Reg. at 81,598–99. None of these rationales justifies Defendants' action.

140.   First, immigration courts have used administrative closure as a procedural tool for decades. Accordingly, elimination of administrative closure marks a departure from past practice. As the Rule notes, the Attorney General's 2018 decision in *Matter of Castro-Tum*, 27 I. & N. Dec. 271, concluded that neither immigration judges nor the BIA have authority to administratively close cases. 85 Fed. Reg. at 81,598. But that decision, which was contrary to longstanding EOIR practice, has now been rejected twice by courts of appeals. *See Meza Morales*, 973 F.3d at 664–67; *Romero*, 937 F.3d at 287–97.[23]

141.   A numerous commenters, the BIA, EOIR consultants, and federal courts have explained, administrative closure *improves* efficiency and facilitates timely resolution of cases. For example, the BIA has observed that administrative closure facilitates "efficient management

---

   [23] The Sixth Circuit disagreed with these decision. *See Hernandez-Serrano v. Barr*, 981 F.3d at 464; *see also id.* at 467, 471 (Clay, J., dissenting) (noting that the Sixth Circuit now comes into conflict with the two other circuits that found such authority to exist under federal regulation).

of the resources" of the immigration courts by allowing immigration judges and the BIA to manage their dockets. *Matter of Avetisyan*, 25 I. & N. Dec. at 695.

142.   Administrative closure is typically employed in cases where the respondent is seeking relief in another forum that would moot or otherwise have a dispositive effect on the proceedings before EOIR. In such cases, "in which two coordinate offices in the executive branch are simultaneously adjudicating collateral applications, closing one proceeding might help advance a case toward resolution." *Meza Morales*, 973 F.3d at 665.

143.   Far from advancing the "efficient and timely administration of immigration proceedings," eliminating administrative closure "would in fact serve to lengthen and delay many of these proceedings by: (1) depriving [immigration judges] and the BIA of flexible docketing measures sometimes required for adjudication of an immigration proceeding, as illustrated by *Avetisyan*, and (2) leading to the reopening of over 330,000 cases upon the motion of either party, straining the burden on immigration courts." *Romero*, 937 F.3d at 297.

144.   The Rule's elimination of administrative closure forces the parties and immigration judges to expend resources on litigation when a grant of relief from USCIS would moot the proceedings.

145.   Immigration judges have emphasized that administrative closure promotes "[e]fficient and fair management of a docket" because it "allows for cases to be held in abeyance, without unnecessary use of court time and resources, when preliminary matters need to be completed for the case to become ripe for further adjudication."[24] It thereby "permits the immigration judge to attend to and resolve cases that are ready for resolution and allows immigration judges to complete more cases."[25] As a result, immigration judges are typically able to render a decision within four months of recalendaring an administratively closed case.[26]

146.   Even the EOIR-commissioned Booz Allen Hamilton study recommended working

---

[24] NAIJ, Letter to Attorney General Sessions, Re: Administrative Closure of Removal Cases at 1 (Jan. 30, 2018), https://bit.ly/398PYX6.

[25] *Id.* at 2.

[26] Booz Allen Hamilton Report at 26.

with DHS "to administratively close cases awaiting adjudication in other agencies or courts" as a way to improve EOIR's processes.[27]

147.   In the face of this evidence, Defendants cite an increase in cases pending before the immigration courts after *Matter of Avetisyan* in 2012 to imply that administrative closure was the cause. 85 Fed. Reg. at 81,599. As multiple commenters, including Plaintiffs RAICES and Tahirih, pointed out, correlation is not causation.[28] Defendants' assertion is fatally flawed; it does not take into account the numerous other factors increasing the immigration court backlog—including the historic rise in asylum seekers arriving at the border, a years-long EOIR hiring freeze that reduced the number of immigration judges, and changes in DHS's enforcement practices.[29]

148.   Defendants also assert that administrative closure is inconsistent with existing regulations, 85 Fed. Reg. at 81,599. That is incorrect, as both the Fourth Circuit and Seventh Circuit concluded. *See Romero*, 937 F.3d at 292 ("[T]he authority of [immigration judges] and the BIA to administratively close cases is conferred by the plain language of 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii)."); *accord Meza Morales*, 973 F.3d at 665.[30] As then-Judge Barrett explained, "some cases are more complex and simply take longer to resolve," *Meza Morales*, 973 F.3d at 665. Defendants did not adequately consider comments explaining that administratively closing unripe cases is an efficient use of resources because it facilitates resolution of other cases.

149.   The Rule contends that the general authorization of administrative closure would render superfluous other regulatory provisions that specify situations in which administrative closure is appropriate. 85 Fed. Reg. at 81,599. Here again, Defendants did not adequately address the Seventh Circuit's rejection of this argument, explaining that the referenced provisions "*mandate* administrative closure in specific circumstances with 'shall' language," as distinct from the discretionary availability of administrative closure in other circumstances. *Meza Morales*, 973

---

[27] *Id*.

[28] Public Comment of RAICES at 2 (September 25, 2020) (noting that "correlation is not causation"), https://bit.ly/3nY2ldY.

[29] *See, e.g.,* Public Comment of Reichlin-Melnick at 7–8.

[30] The Sixth Circuit has created a circuit split on the issue. *See supra* notes 3, 34.

F.3d at 666 (emphasis added).

150.    Nor was EOIR correct that immigration judges' and the BIA's authority to manage their own docket conflicts with the EOIR leadership's authority to "[d]irect that the adjudication of certain cases be deferred." 8 C.F.R. §§ 1003.0(b)(1)(ii), 1003.1(a)(2)(i)(C), 1003.9(b)(3); 85 Fed. Reg. at 81,599. The fact that EOIR supervising officials have the authority to order deferrals in cases whose result they cannot otherwise direct, *see* 8 C.F.R. §§ 1003.0(c), 1003.1(a)(2)(ii), 1003.9(c), says nothing about the authority of immigration judges handling those cases, who are tasked with "exercis[ing] their independent judgment and discretion and … tak[ing] any action … that is appropriate and necessary for the disposition of such cases." 8 C.F.R. § 1003.10(b); *accord* 8 C.F.R. § 1003.1(d)(1)(ii).

151.    Defendants also did not adequately address the reliance interests at issue. Countless individuals currently in proceedings before EOIR are pursuing relief before USCIS or state courts while their proceedings are administratively closed. Although the Rule suggests that reliance interests are not a concern because the Rule applies only prospectively, 85 Fed. Reg. at 81,601, either EOIR or DHS could re-calendar all cases that are currently administratively closed.  As a result, people in the Fourth and Seventh Circuit could no longer pursue administrative closure despite recent judicial decisions sanctioning this longstanding procedural tool. Defendants dismiss or ignore these interests with little explanation. *See, e.g.*, 85 Fed. Reg. at 81,645 (finding concerns about reliance interests with respect to administrative closure "misplaced"); *see also id.* at 81,601 (same). Indeed, Defendants absurdly suggest that "nothing in the rule prohibits a practitioner from seeking administrative closure," *id.*, even though such requests would be frivolous in many cases.

152.    EOIR seeks to minimize the unfairness of the Rule by suggesting that people can request continuances instead of administrative closure. 85 Fed. Reg. at 81,598 n.24.  That suggestion ignores the burden and inefficiency of continuances. Plaintiffs, individuals in removal proceedings, DHS, and immigration judges will be required to substantiate or evaluate the showing required for every continuance and waste resources with unnecessary court appearances.

153.    As the BIA noted in *Avetisyan*, this dual-track process can even delay ultimate relief, forcing many to live with uncertainty and causing an unnecessary drain on the courts' and

DHS's resources. *See Avetisyan*, 25 I. & N. Dec. at 689–90 (explaining that the continuances required DHS to transfer the file back and forth between DHS's visa petition unit and litigating counsel, leading to six continuances while the visa petition was pending).

154.   The Rule's reliance on continuances is also disingenuous because in January 8, 2021, Defendant McHenry issued a memo restricting access to continuances and Defendants have proposed a rule that would restrict continuances. As restrictions on continuances become increasingly severe, the parties must be prepared to address all issues when a continuance is denied. This places a severe burden on Plaintiffs, other pro bono legal providers, and people in removal proceedings.

155.   As a result, it will be difficult for organizations like Plaintiffs to place cases with *pro bono* or affiliate partners, who tend to limit their representation to one form of relief. Organizations like Plaintiffs will also have to divert resources and hire more staff for direct representation or *pro se* support. Even for cases Plaintiffs can place with *pro bono* attorneys or affiliates, Plaintiffs will need to spend much more time on mentoring those attorneys and affiliates. Defendants failed to give adequate consideration to this problem.

156.   Elimination of administrative closure will also prevent organizations like Plaintiffs from seeking hardship waivers of unlawful presence. 8 U.S.C. § 1182(a)(9)(B)(v). Although commenters noted the effect this change would have on families, 85 Fed. Reg. at 81,643, the Rule gave that effect virtually no consideration because EOIR considered the link between waivers and administrative closure "too attenuated to outweigh the significant legal and policy concerns raised by the Department concerning administrative closure." *Id*. at 81,644.  But as even EOIR acknowledged, 85 Fed. Reg. at 81,601, *id*. at 81,644, people in removal proceedings can obtain the waiver of unlawful presence only if their removal proceedings are administratively closed. *See* 8 C.F.R. § 212.7(e)(4)(iii). Therefore, eliminating administrative closure makes it impossible for many noncitizens to apply for the waiver.

157.   Defendants justify their approach by contending that individuals could take voluntary departure and then seek a provisional waiver before DHS. 85 Fed. Reg. at 81,644. But that contention conflicts with DHS regulations, *see Expansion of Provisional Unlawful Presence*

*Waivers of Inadmissibility*, 81 Fed. Reg. 50,243, 50,256 (July 29, 2016) ("[I]ndividuals granted voluntary departure will not be eligible for provisional waivers."). Rather than addressing the effect of the Rule on provisional waivers, the Rule concludes, "DHS may choose to update their regulations as a result of the Department's amendments regarding administrative closure authority, but any concerns with DHS's policy decisions are outside the scope of this rule." 85 Fed. Reg. at 81,599. That does not suffice. Defendants cannot just declare serious problems identified by comments as "outside the scope of the rule," *id.*, because they regulate against the background of existing law. Because Defendants did not adequately consider the interplay of the Rule with other regulations, they failed to assess the Rule's full impact and weigh its advantages against the disadvantages commenters noted. This too is arbitrary and capricious, in violation of the APA.

### 2.      Limits on BIA's Remand Authority

158.   The Rule severely limits the BIA's authority to remand for factfinding, for consideration of changes in law, and for consideration of new evidence. These restrictions are inconsistent with the ordinary operation of appellate courts and needlessly accelerate the removal of people with meritorious claims for relief.

159.   Under the Rule, the BIA may not remand to the immigration judge for further factfinding unless the party seeking a remand—almost always the noncitizen—meets new criteria. *See* 85 Fed. Reg. at 81,651 (new 8 C.F.R. § 1003.1(d)(3)(iv)(D)). Specifically, the Rule permits a remand for factfinding only if (1) the noncitizen "preserved the issue" before the immigration judge and "attempted to adduce the additional facts"; (2) the factfinding would "alter the outcome" of the case; *and* (3) either the immigration judge's factual findings were "clearly erroneous," or the immigration judge committed an error of law that requires additional factfinding. *Id.* These provisions are arbitrary and capricious because they illogically require the noncitizen or their advocate to predict the immigration judge's legal or factual errors before a decision is rendered.

160.   The restrictions on remand for factfinding also conflict with *Franco-Gonzalez v. Holder*, which involves safeguards for mentally ill or incompetent noncitizens under the INA, the Rehabilitation Act, and the Due Process Clause. No. 10-cv-02211-DMG, 2013 WL 3674492 (C.D.

Cal. Apr. 23, 2013). The permanent injunction in that case, which applies to noncitizens detained in Arizona, California, and Washington, provides that when competency concerns arise, "the [BIA] *shall* order a remand to the immigration judge with instructions to apply the procedures" for safeguards that are afforded to class members. *Franco-Gonzalez v. Holder*, No. 10-cv-02211-DMG, (C.D. Cal. Oct. 29, 2014), ECF No. 786, Order at 23 (emphasis added). The Rule prohibits this court-ordered process.

161.   The Rule also restricts remands for changes in law. The Rule permits the BIA to remand a case based on a change in law only if "that change has vitiated all grounds of removability." 85 Fed. Reg. 81,652 (new 8 C.F.R. § 1003.1(d)(7)(ii)(C)). Remand is not permitted if the change in law merely adds a new type of relief from removal. The result is profoundly unfair. For example, a lawful permanent resident is foreclosed from seeking cancellation of removal before the immigration judge if their conviction is an aggravated felony under binding precedent. *See* 8 U.S.C. § 1229b(a)(3). In 2018, the Supreme Court struck down part of the definition of a common aggravated felony ground as unconstitutionally vague. *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). An appellant who remained removable but became eligible for cancellation of removal under *Dimaya* would have no avenue to obtain a remand and would be ordered removed based in part on an unconstitutional deportation ground.

162.   The Rule's bar on remands for the introduction of new evidence are particularly arbitrary and unfair because they force people who are eligible for relief to be ordered removed, and in some cases actually removed, before they can fully present their claims. Under the Rule, "the [BIA] shall not receive or review new evidence submitted on appeal, shall not remand a case for consideration of new evidence received on appeal, and shall not consider a motion to remand based on new evidence." 85 Fed. Reg. at 81,652 (new 8 C.F.R. § 1003.1(d)(7)(v)(A)). An individual may secure a remand only if the new evidence relates to EOIR's jurisdiction or the individual's removability—not if the evidence relates to relief from removal. *Id*. (new 8 C.F.R. § 1003.1(d)(7)(v)(B)).

163.   The Rule requires individuals to wait until their removal orders become final and then file motions to reopen, instead of filing motions to remand while their cases are pending. *See*

85 Fed. Reg. at 81,611 & n.37. Because ICE may execute a removal order as soon as it is finalized by the BIA, the Rule will force individuals to litigate motions to reopen from abroad, at substantial disadvantage, unless they can secure a stay of removal. This approach is arbitrary and capricious because it ignores the significant consequences that can flow from an order of removal, including prolonged family separation, and persecution or torture. It also ignores the challenges of litigation following an order of removal, which may entail not only a motion to reopen before the BIA, but also a motion to stay removal before the BIA, petition for review before the Court of Appeals, and motion to stay removal before the Court of Appeals.

164.   Many people in removal proceedings, especially those who are *pro se* and/or detained, will be unable to secure stays of removal even if they have meritorious claims and face irreparable harm if deported. As a result, the Rule's limits on remands will lead to needless deportation of individuals who are entitled to relief—in some cases to countries where they face persecution or torture, in violation of *non-refoulement* obligations. *See* 8 U.S.C. § 1231(b)(3)(A) (prohibiting removal to country where noncitizen's "life or freedom would be threatened" because of "race, religion, nationality, membership in a particular social group, or political opinion"). Removal from the United States may effectively extinguish a person's ability to seek review of their removal order and return to the United States if successful. A person who experiences persecution, poverty, or other hardship in their home country may face nearly insurmountable obstacles to finding counsel, filing legal challenges, or communicate with already-retained counsel.

165.   Defendants contend that a motion to reopen is an adequate substitute for a motion to remand. That contention is arbitrary and capricious. And the Rule's justifications for largely eliminating remands based on new evidence fall far short of the reasoned explanation necessary in light of Defendants' departure from longstanding agency precedent endorsing remand motions. *See Matter of Coelho,* 20 I. & N. Dec. 464, 470-71.

166.   Defendants assert that the elimination of remands would reduce "gamesmanship" by noncitizens. *See, e.g.*, 85 Fed. Reg. at 81,611-12. But they offer no evidence of alleged gamesmanship. They also ignore that existing standards already allow the BIA to deny motions

that are not based on material or previously unavailable evidence. And they fail to contend with the many legitimate reasons asylum seekers may not initially have access to evidence, as explained by Plaintiff Tahirih and other commenters. Tahirih Comment at 13-16.

167.   Defendants' justification also exposes the Rule's arbitrariness.  The Rule creates an exception for DHS to present new evidence at any time based on identity, law enforcement, or security investigations, without any requirement that the evidence be material or previously unavailable. EOIR offers no explanation as to why preserving that right for DHS alone does not promote gamesmanship on the part of DHS.

168.   Defendants claim that channeling motions to remand into motions to reopen is "more efficient" and reduces the "burden" on the agency. 85 Fed. Reg. 81,611-12. This is false. The same evidence and arguments that would have been offered in support of a motion to remand will be offered in support of a motion to reopen—only after the BIA has adjudicated the appeal based on a stale record. And, as explained above, what would have been one motion to remand will become a motion to reopen at the BIA, a stay motion at the BIA, a petition for review at the circuit, and a stay motion at the circuit. The Rule promotes "efficiency" only in the sense that those who are removed may be unable to pursue these motions.

169.   Defendants also offer no evidence to support their assertion that the BIA has failed to adjudicate motions to remand in a consistent manner. *See* 85 Fed. Reg. at 52,500-01. In any case, the Rule does not solve the problem they claim they are trying to fix. *Matter of Coelho*, 20 I. & N. Dec. at 471; *see also* 85 Fed. Reg. at 81,611 (acknowledging that "motions to remand are generally considered analogous to motions to reopen or reconsider").

170.   All of the harms described above are exacerbated by Defendants' parallel efforts to limit motions to reopen and stays of removal in this Rule and in the Motion to Reopen NPRM. This Rule's elimination of *sua sponte* motions to reopen means that people who could have filed a motion to remand will instead be forced to exhaust their one and only motion to reopen, potentially foregoing any claims to reopening that arise later.

171.   The Motion to Reopen NPRM creates additional hurdles to accessing the BIA's already-inadequate process for adjudicating stays of removal, increasing the risk that people will

41

be removed before they can pursue a motion to reopen. For example, people in removal proceedings would be required to first seek a stay with ICE and wait until it is denied or five business days have passed before even moving for a stay with the BIA. ICE's process for adjudicating stays has its own complications, including a separate fee, a requirement that the application be submitted in person, and a requirement that the applicant produce identity documents that many refugees, for instance, do not have. Defendants' failure to even acknowledge the interaction of these changes renders the Rule arbitrary and capricious.

### 3. Limits on Scope of Remand

172.   The Rule prohibits an immigration judge from "consider[ing] any issues outside the scope or purpose" of a limited or qualified BIA remand, except issues pertaining to jurisdiction. 85 Fed. Reg. at 81,652 (new 8 C.F.R. § 1003.1(d)(7)(iii)).

173.   The Rule thus prevents supplementing the record upon remand if there is a change in law or circumstances while a person is waiting for a new hearing. That wait could range anywhere from months to several years.

174.   Defendants contend that current practices cause inefficiency by "encourag[ing] the re-litigation of issues." 85 Fed. Reg. at 81,615.  That contention ignores the reality that new facts or intervening law are issues that would *not* have been litigated before. Moreover, because the Rule prohibits an immigration judge from hearing new facts or legal arguments when a case is remanded, it produces the absurd result of requiring immigration judges to ignore controlling law or relevant facts at the time of the hearing. This will also result in orders of removal that are based on outdated law and facts and force Plaintiffs to engage in additional court of appeals litigation to overturn such orders. The Rule will therefore cause the inefficiency it purportedly seeks to eliminate.

175.   The Rule also eliminates the BIA's practice of remanding a case based on the "totality of the circumstances," 85 Fed. Reg. at 81,652 (new 8 C.F.R. § 1003.1(7)(ii)(B)). The BIA often uses that standard for remands if it is clear that a person did not understand the proceedings, or that the immigration judge relied on a mistaken belief or engaged in blatant misconduct.

176.   A blanket prohibition on such remands will tie the hands of the BIA and force the

issuance of denials and removal orders based on undeveloped records or other errors. Especially with the strict limitations imposed by this Rule on other forms of remand and reopening, there are virtually no remaining procedures available to address such miscarriages of justice. This too is arbitrary and capricious.

### 4.   Elimination of *Sua Sponte* Authority to Reopen

177.   For as long as the BIA has existed, *sua sponte* reopening or reconsideration has been a vital mechanism for curing later-discovered injustices or accounting for new facts or law that make a noncitizen eligible for relief, or not removable at all. The Rule prohibits both immigration judges and the BIA from reopening or reconsidering a case *sua sponte*. The only exception to the Rule's withdrawal of *sua sponte* authority is to correct minor mistakes such as typographical errors. *See* 85 Fed. Reg. at 81,654–55 (new 8 C.F.R. §§ 1003.2(a), 1003.23(b)(1)); *cf.* 8 C.F.R. §§ 1003.2(a), 1003.23(b)(1).

178.   *Sua sponte* authority allows immigration judges and the BIA to reopen a case in "exceptional situations," such as where a "fundamental change" in law materially impacts a noncitizen's case. *Matter of J-J-*, 21 I. & N. Dec. 976, 984 (BIA 1997); *Matter of X-G-W-*, 22 I. & N. Dec. 71, 74 (BIA 1998). Immigration judges and the BIA often exercise this authority after noncitizens alert them to relevant facts or law via motion.

179.   In place of this traditional authority, the Rule permits reopening outside the time and number limits in just two circumstances: (a) where the individual claims U.S. citizenship, or, (b) subject to a three-member BIA decision only, where the individual's "removability is vitiated *in toto* prior to the execution of the removal order" *and* they exercised diligence in pursuing the motion. 85 Fed. Reg. at 81,591 (new 8 C.F.R. §§ 1003.2(c)(3)(v)-(vi), 1003.23(b)(4)(v)).

180.   Defendants' elimination of *sua sponte* authority is arbitrary and capricious because, among other things, they failed to consider that some noncitizens will be forever barred from reopening their removal orders, resulting in wrongful deportations.

181.   First, individuals who are newly eligible for relief based on a change of law or facts will be left with no recourse. For example, an individual who is eligible for discretionary relief following the vacatur of a criminal conviction, a spouse of a U.S. citizen with an approved family-

based petition, or an individual whose changed personal circumstances entitle them to fear-based protection from removal would not fall within the two exceptions to the time and number limits created by the Rule. Defendants assert repeatedly that a statutory motion to reopen with equitable tolling remains available in such situations. *See, e.g.*, 85 Fed. Reg. at 81,633. But even in cases where a person can demonstrate the due diligence required for tolling, it is far from settled that new eligibility for relief would constitute circumstances beyond the individual's control that trigger tolling. *Socop-Gonzalez*, 272 F.3d at 1193.

182.   Second, individuals who discover that a miscarriage of justice occurred in their removal proceedings will be stripped of an important remedy. For example, a person who suffered ineffective assistance of counsel, who never received a competency assessment despite indicia of mental illness, or who was wrongly denied an opportunity to apply for relief would not fall within the Rule's exceptions to time and number limits. These individuals will be denied reopening unless they can make a successful equitable tolling argument. Defendants rejected commenters' concerns that the standard for equitable tolling is difficult to meet, citing the "frequency with which [tolling] has been argued" (making no mention of how often it is *successful*) and ignoring the BIA's exacting interpretation of the diligence requirement. 85 Fed. Reg. at 81,633; *see, e.g.*, *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1067 (2020) (describing procedural history of case where BIA found noncitizen who filed motion to reopen one month after relevant change in law was not diligent).

183.   Third, even individuals who are no longer removable at all—and thus do fall within the Rule's limited exceptions—will be subject to a newly-imposed diligence requirement to reopen their removal proceedings. The BIA and the Ninth Circuit have recognized that deporting a person who is not removable under immigration law is a "gross miscarriage of justice"— regardless of whether the person exercises diligence in pursuing legal remedies. *See Vega-Anguiano v. Barr*, 982 F.3d 542, 547, 549 (9th Cir. 2019) (citing BIA precedent that a "gross miscarriage of justice occurs when a deportation or removal order had no valid legal basis at the time of its issuance *or* at the time of its execution" and finding no diligence requirement to bring collateral attack); *cf. Estrada-Rosales v. INS*, 645 F.2d 819, 821 (9th Cir. 1981) (holding that

deportation based on a subsequently vacated conviction is not "legally executed"). The Rule will, contrary to this precedent, cause the deportation of individuals who are not removable but cannot show "diligence" as the BIA will define it in to-be-decided cases.

184.   Defendants' claim that a joint motion to reopen remains available for the situations described above falls flat. As commenters explained, this "alternative" to *sua sponte* authority "places ultimate authority to reopen or reconsider a case on DHS," an adverse party that rarely agrees to join such motions. 85 Fed. Reg. at 81,632. Defendants' only response to this point was to repeat that noncitizens "may seek a joint motion with DHS." *Id.* at 81,633.

185.   Every justification provided by Defendants for the withdrawal of *sua sponte* reopening authority is arbitrary and capricious. First, Defendants claim that the lack of meaningful standards for when *sua sponte* reopening should be granted has resulted in "potential for inconsistent application or even abuse." 85 Fed. Reg. at 81,628. But as commenters pointed out, Defendants cite no examples. *Id.* at 81,630. The alleged harms are purely speculative, as the agency recognized in calling them "potential" harms.

186.   The "exceptional circumstances" standard for granting *sua sponte* reopening is guided by the precedent cited by Defendants. *See, e.g.*, *Matter of G-D-*, 22 I. & N. Dec. 1132, 1134-35 (BIA 1999) (defining one type of "exceptional" situation warranting sua sponte reopening: a "fundamental change in the law" upon which the noncitizen's case "manifestly turn[s]"). Indeed, immigration law is "replete" with similar standards that immigration judges and the BIA routinely apply. Public Comment of National Association of Immigration Judges at 6 (Sept. 25, 2020), https://tinyurl.com/y4lrl48f; *see, e.g.*, 8 U.S.C. § 1229b(b)(1)(D) ("exceptional and extremely unusual hardship" standard for cancellation of removal). And if the lack of a standard were the true problem, Defendants could have created one, as commenters suggested. *See* 85 Fed. Reg. at 81,632. Defendants rejected that suggestion with only the conclusory assertion that "further elaboration" of the standard would not address the concern. *Id.* at 81,633.

187.   As for the alleged "abuse" or "improper" use of *sua sponte* authority, Defendants apparently refer to the BIA's longstanding practice of exercising that authority in response to a party's motion. *See, e.g.*, 85 Fed. Reg. at 81,631 (calling reopening in response to a motion

"improper"); 85 Fed. Reg. at 52,505 (referring to BIA's "misapplication of the *sua sponte* label"). Nowhere do Defendants explain why this practice is improper or abusive. At least one precedential BIA decision *expressly invited* noncitizens to file motions seeking *sua sponte* reopening or reconsideration. *Matter of X-G-W-*, 22 I. & N. Dec. 71, 74 (BIA 1998). Defendants also do not explain how an immigration judge or the BIA would learn of developments in a noncitizen's case that may constitute an exceptional situation other than through a motion. *See Matter of G-D-*, 22 I. & N. Dec. 1132, 1134 (BIA 1999) (stating that the BIA "must *be persuaded* that the respondent's situation is truly exceptional before we will intervene") (emphasis added). Defendants' semantic problem with the *sua sponte* term does not justify withdrawing the authority long exercised by immigration judges and the BIA.

188.   Second, Defendants' claim that *sua sponte* authority "undermines efficiency" lacks factual support. *See, e.g.*, 85 Fed. Reg. at 81,633. Defendants offer no evidence, for example, of the volume of *sua sponte* motions, the time required to adjudicate them, or their relative contribution to the workload of the immigration courts and BIA. One report Defendants cited in the Rule actually shows that aggregate number of motions to reopen and reconsider filed with the immigration courts and the BIA declined slightly from 2008 to 2020. *Id.* at 81,612 (citing EOIR, *Adjudication Statistics: Motions*, Oct. 13, 2020, *https://tinyurl.com/y457sxrt*).[31]

189.   If anything, the elimination of *sua sponte* authority will impede efficiency. What would have been *sua sponte* motions will be channeled into statutory motions to reopen which often require equitable tolling, entail more complex factual and legal determinations, and are subject to federal court review. *Guerrero-Lasprilla*, 140 S. Ct. at 1068 (holding that whether noncitizen exercised due diligence for purposes of equitable tolling is a reviewable mixed question of law and fact). Given that the BIA often acts through a single judge, the requirement that certain motions to reopen can be granted only by a three-member panel of the BIA further undermines the efficiency rationale.

---

[31] *See* Public Comment of the Immigrant Justice Network, Immigrant Legal Resource Center, Immigrant Defense Project, Just Futures Law, and the National Immigration Project of the National Lawyers Guild at 12 (September 24, 2020), https://bit.ly/39LGrp5.

190.   Third, Defendants claim that the elimination of *sua sponte* authority promotes finality in immigration proceedings. *See, e.g.*, 85 Fed. Reg. at 81,628. This justification is belied by Defendants' decision to exempt DHS from time and number limits on motions filed with the BIA. *Id.* at 81,591. Moreover, the agency has long recognized that finality should be tempered by "the interest of justice." *Matter of X-G-W-*, 22 I. & N. Dec. 71, 73 (BIA 1998); *Matter of G-C-L-*, 23 I. & N. Dec. 359, 362 (BIA 2002) (recognizing that policy of granting *sua sponte* motions provided critical relief to individuals adversely impacted by "regulations designed to bring finality to immigration proceedings"). Invoking a generic goal such as finality, with no effort to weigh it against competing goals that the agency itself has acknowledged as legitimate, is arbitrary and capricious.

191.   The Rule is also arbitrary and capricious because Defendants wholly failed to assess the reliance interests engendered by the agency's decades-long practice of entertaining *sua sponte* motions to reopen and reconsider. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S.Ct. 1891, 1915 (2020) ("*Regents*"). A mechanism for reopening a removal order outside of time and number limits in the interest of justice has *always* existed. In establishing time and number limits for the first time, the Attorney General declined to include a "good cause" exception because "*sua sponte* authority to reopen removal proceedings accomplished the same goal." *Avila-Santoyo v. U.S. Atty. Gen.*, 713 F.3d 1357, 1363 (11th Cir. 2013). This is precisely the type of "longstanding polic[y]" that creates reliance interests. *Regents*, 140 S. Ct. at 1913 (citation omitted).

192.   Yet the Rule ignores the reliance interests of individuals directly affected by the elimination of *sua sponte* authority. Many noncitizens with removal orders have expended considerable time and resources pursuing post-conviction relief or pardons that would eliminate grounds of removal, or petitions that would enable them to adjust to lawful permanent resident status. These individuals have relied on the availability of *sua sponte* reopening or reconsideration, and their efforts are rendered futile by Defendants' abrupt change of policy.

193.   For example, Nak Kim Chhoeun was ordered removed in 2003 based on Pennsylvania convictions for simple assault and carrying a firearm, but was released on an order

of supervision because Cambodia would not repatriate him. After ICE again threatened to remove him in 2017, Mr. Chhoeun hired two attorneys for post-conviction relief, submitted hundreds of pages of documentation in support of a pardon application, testified before the Pennsylvania Board of Pardons, and finally secured a full and unconditional gubernatorial pardon on January 15, 2021. While the pardon waives the aggravated felony ground of removal and makes Mr. Chhoeun eligible for cancellation of removal for lawful permanent residents, he remains removable on the firearms ground and thus does not qualify for reopening under the Rule. *See* 8 U.S.C. §§ 1227(a)(2)(A)(vi) (listing deportation grounds waived by pardon), 1229b(a) (setting out requirements for cancellation of removal). For Mr. Chhoeun and others in his situation, the Rule negates years-long efforts to secure clemency or post-conviction relief.

194.   The Rule makes no mention of any reliance interests of the type described above. Defendants failed to even "assess whether there *were* reliance interests," much less determine their significance and weigh them against policy concerns, as required by the APA. *Regents*, 140 S. Ct. at 1915 (emphasis added).

195.   Finally, Defendants compound the unfairness of the Rule by applying the withdrawal of *sua sponte* reopening authority to "all cases, regardless of posture, on the effective date." 85 Fed. Reg. at 81,588. Individuals whose motions to reopen are pending before the BIA on the effective date—who sought *sua sponte* reopening or reconsideration based on established BIA precedent—will have their motions summarily denied. And they will be unable to file new motions advancing alternative arguments because those motions will be both time and number-barred. The application of the Rule to pending motions is manifestly unfair and impermissibly retroactive, disrupting noncitizens' reasonable expectations that their requests for *sua sponte* reopening would be considered. *Cf. INS v. St. Cyr*, 533 U.S. 289, 321 (2001) (explaining that a statute is impermissibly retroactive if it "impairs vested rights" or "attaches a new disability," among other things).

### 5.    Changes to the Appellate Briefing Schedule

196.   The Rule introduces four significant changes to the appellate briefing schedule: (1) it reduces the maximum allowable time for an extension of the opening brief from 90 to 14 days,

48

regardless of circumstances, and regardless of whether the opposing party would consent, 85 Fed. Reg. at 81,654 (new 8 C.F.R. § 1003.3(c)(1)); (2) it limits the parties to one extension, again regardless of circumstances and again regardless of whether the opposing party would consent, *id*.; (3)  it eliminates consecutive briefing for non-detained BIA appeals, *id*.; it shortens the time for submitting reply briefs from 21 to 14 days. *Id.*

197.   The Rule purports to impose these changes to expedite appeals. But reducing the time available to draft BIA briefs will not have any effect on the duration that an appeal will be pending before the BIA, particularly in light of the existing backlogs. Instead, the Rule's changes will make it more difficult for noncitizens to mount appeals and obtain legal representation.

198.   The INA encourages legal representation by requiring the Attorney General to advise noncitizens seeking asylum of the privilege of being represented by counsel and provide them with the List of Pro Bono Legal Services Providers. 8 U.S.C. § 1158(d)(4). Likewise, the INA requires that individuals in removal proceedings be provided a list of organizations that offer pro bono representation. *Id*. § 1229(b)(2); 8 C.F.R. § 1003.61(b).

199.   The Rule undermines these provisions by making it almost impossible to obtain effective representation in BIA appeals. The BIA's mail-based system, unpredictable briefing schedules, and the short timeline to file a brief *already* limit the ability of noncitizens to obtain counsel. Unrepresented noncitizens expend the majority of their appeal timeline waiting to receive materials including the transcript in the mail and seeking out appellate counsel. By the time prospective counsel receives these materials, counsel often has less than two weeks to review the record, ascertain the merits of a claim, finalize representation agreements, and prepare an appellate brief. The abbreviated timeline makes an already-difficult task effectively impossible.

200.   Shortened briefing schedules also make it nearly impossible for litigants to represent themselves, as *pro s*e litigants already struggle to make their cases before the BIA given language barriers and limited access to resources that would aid in appellate brief writing. These challenges are especially profound for detained pro se noncitizens. For these individuals, their mail is further delayed and they have limited access to law libraries and phones.

201.   This problem is compounded by the Attorney General's recent decision requiring

the BIA to examine substantive issues on all statutory elements *de novo* without deference to the parties' stipulations below. *See Matter of A-C-A-A-*, 28 I. & N. Dec. 84. This makes the process of writing a BIA brief more substantively complex and cumbersome.

202.   These changes will effectively deprive noncitizens of the right to appeal to the BIA, the right to counsel of their choosing (at no expense to the Government), and a reasonable opportunity to present arguments and evidence. *See* 8 U.S.C. §§ 1229a(b)(4), 1362. Defendants failed to consider this in effectuating the Rule.

203.   The Rule's new concurrent briefing requirement also impedes effective representation.  It forces the noncitizen to anticipate what the Government will argue and also disprove any possible ground upon which the BIA could affirm the immigration judge's decision. This guts the right to counsel and the right to a meaningful opportunity be heard.

204.   Defendants' justifications for these changes are irrational. First, Defendants claim that these changes would curb "gamesmanship" and end "last-minute delay tactics." *See* 85 Fed. Reg. at 81,637. Again, Defendants offer no evidence of alleged gamesmanship. Modest briefing extensions, reply briefs, and consecutive briefing are all ordinary features of appellate process. Tellingly, Defendants did not identify any other court in which judges are forbidden from giving extensions for briefing in their cases regardless of circumstances, and even where the opposing party consents to the extension.

205.   Second, Defendants contend that these provisions will make the BIA's adjudication process more efficient. *See* 85 Fed. Reg. at 81,637. That contention ignores the major causes of delay in the current system, including EOIR's paper-based system and backlog of unadjudicated cases. The Rule does nothing to address protracted delays before the briefing schedule is issued and after briefs are filed. In other words, the Rule increases the noncitizen's need to "hurry up" but does nothing to address "wait" that inevitably follows. Indeed, BIA decisions are often issued more than a year after briefing is complete.

206.    Indeed, the Rule's mandate that the BIA conduct an individualized good cause analysis for every extension request undermines any possible efficiency benefit.

207.   Defendants' responses on this issue confirm that Defendants did not consider these

aspects of the problem or alternative solutions. For instance, Defendants' response that noncitizens may overcome any timing restrictions by beginning to prepare their appeal while they await a briefing schedule ignores comments explaining the practical problem with that approach. The BIA provides the immigration judge's decision and the transcripts at the same time as the briefing schedule. Without access to the decision and transcript, noncitizens and/or their counsel, like Plaintiffs, have no reasonable way to meaningfully prepare an appeal in advance.

208.   EOIR is well aware of these problems. The BIA Pro Bono Project provided counsel with a full copy of the record of proceedings and automatically reset the briefing schedule to allow newly-engaged pro bono counsel time to adequately prepare an appellate brief. It did so with the understanding that such accommodations actually "enable[ ] the BIA to provide a more effective and timely case review."[32] Despite previously acknowledging the utility of such procedures, Defendants restricted those same procedures in the Rule without a reasoned explanation.

209.   Defendants' reasons for concurrent briefing are also arbitrary. Defendants claim that there is not a "legal or operational reason to adjudicate non-detained cases in a less efficient manner than detained cases." 85 Fed. Reg. at 52,499 (NPRM); *see also* 85 Fed. Reg. at 81,636. But in the detained context, a person's liberty interests and the Government's expense related to detention at least weigh in favor of speedier adjudications (though, speedier adjudication does not require concurrent briefing). EOIR instituted concurrent briefing for detained cases nearly 20 years ago; at that time, it considered but then reversed its proposal to implement a concurrent briefing schedule in non-detained appeals, too. *See* 67 Fed Reg. at 54895. Defendants do not adequately explain the reasons for rejecting their earlier conclusions.

210.   Defendants' justification for concurrent appeals and limits on reply briefs is even more irrational when DHS appeals. DHS suggests that noncitizens' interests are protected if they brief all issues on the notice of appeal. 85 Fed. Reg. at 81,636. But DHS routinely reserves the right to raise additional arguments and often adjusts its arguments based on a review of the transcript.

---

[32] EOIR DOJ, *BIA Pro Bono Project* (last updated Oct. 20, 2020), https://tinyurl.com/y5bqq65l.

211.   Defendants suggest that EOIR's plan to institute an electronic filing system at the BIA mitigates commenters' concerns. *See* 85 Fed. Reg. at 81,638. But there is no indication that the electronic filing system will actually be implemented in the near future, and Defendants do not explain why changes to briefing extensions are warranted before that system comes online. Defendants did not seriously consider the obvious alternative of deferring the changes until an electronic filing system is in place. Nor did Defendants confront the fact that e-filing will not improve matters for many of those in removal proceedings. People in immigration detention centers rarely have access to the internet, which means an e-filing system will not mitigate the harms to *pro se*, detained noncitizens.

212.   Finally, Defendants did not consider how the Rule's new briefing procedures interact with other changes in the Rule and with BIA practice generally. For example, the Rule grants the BIA new authority to affirm on any basis in the record, and an Attorney General decision disallows the BIA's reliance on immigration court level stipulations. As a result of these changes, appellate briefs will have to not only challenge the immigration judge's errors, but also anticipate the Government's response and disprove any other reasoning the BIA could offer. Similarly, Defendants fail to consider the compound effect of numerous other sub-regulatory changes, including limiting BIA briefs and motions to 25 pages, and adopting a policy that disfavors granting extensions.[33] These changes make the Rule's restrictions even more oppressive for noncitizens and legal service providers.

### 6.   License to Engage in Impermissible Factfinding

213.   The Rule delegates to the BIA the new, and exceedingly broad authority to make findings of fact, contrary to the ordinary practice of appellate bodies. It also creates additional burdens for Plaintiffs and their clients, who must relitigate noncitizens' removal proceedings before an appellate body with a limited ability to review adverse evidence or to present counter evidence. These provisions violate the INA, deprive noncitizens of due process, and will force Plaintiffs to undertake more complicated and resource-intensive approaches to appellate

---

[33] AILA, *Practice Alert:  Updates to the BIA Practice Manual, Briefing Extensions Now Disfavored* (Dec. 11, 2019), https://bit.ly/3pOEXkd.

representation on behalf of those they serve.

214.   The Rule allows the BIA to take "administrative notice" of any purported facts "not reasonably subject to dispute," including "[t]he contents of official documents outside the record," "[f]acts that can be accurately and readily determined from official government sources and whose accuracy is not disputed," and "[u]ndisputed facts contained in the record." 85 Fed. Reg. at 81,651 (new 8 C.F.R. § 1003.1(d)(3)(iv)(A)). The BIA must only give notice to the parties or an opportunity to respond if the noticed facts are the explicit basis for *overturning* a grant of relief. *Id*. (new 8 C.F.R. § 1003.1(d)(3)(iv)(B)). It need not provide any notice or opportunity to respond if the noticed facts are the basis for affirming a removal order, or if those facts merely inform the BIA's decision to reverse an immigration judge's decision without forming the explicit basis. *See id.*

215.   These provisions are inconsistent with the requirement that factfinding take place in the trial court. *See* 8 U.S.C. § 1229a(a)(3), (b)(1); 8 C.F.R. § 1003.1(d)(3). The provisions are also contrary to the way normal appellate courts function, and deprive noncitizens of the opportunity to be heard and present evidence on facts that they reasonably dispute.

216.   Official documents or facts from government sources may contain incorrect or disputable material. For example, the Rule explicitly contemplates that the BIA will deem State Department Reports an "official government source[]," *see* 85 Fed. Reg. at 81,602, even though they go to the central issues in a fear-based case, are subject to interpretation and rebuttal, and are *not* accepted as fact. *Cf. Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000) (stating that it would be inappropriate for the BIA to "give conclusive weight to statements in [State Department] reports that not only are not incontestable, but also are not even facts"). Moreover, Department of State reports are increasingly politicized,[34] yet the Rule does not ensure that noncitizens will have an opportunity to show that they are reasonably disputed.

217.   This is a serious problem the agency failed to adequately consider. In vacating

---

[34] *See, e.g.*, Asylum Research Center, *Comparative Analysis of US Department of State Country Reports on Human Rights Practices (2016-2019)* (Oct. 21, 2020), https://bit.ly/35n135K; Catholic Legal Immigration Network, Inc., *Department of State Country Report on Human Rights Practices: Honduras: Comparison Chart: 2016 and 2019* (Oct. 20, 2020), http://bit.ly/3bmcb6L.

denials of both asylum and relief under the Convention Against Torture, the Ninth Circuit has repeatedly made clear that the Mexican government's supposed efforts "to combat drug cartels and the corruption of public officials" obscure the reality of ongoing, systemic violence, torture, and corruption in that country. *Xochihua-Jaimes v. Barr*, 962 F.3d 1175, 1184-85 (9th Cir. 2020) (citing earlier cases to the same effect). Current events relevant to removal proceedings, and the meaning of those events, are therefore very frequently subject to reasonable dispute.

218.   The Rule also permits the BIA to consider other unreliable DHS-issued documents—such as border interviews contained in Form I-213s—as "official documents." Such materials invariably present adverse facts that the noncitizen has a right to examine and refute.[35]

219.   The Rule offers no administrable definition of "official documents," or explain what constitutes an "undisputed" fact.

220.   Even in the limited circumstances in which the Rule provides for notice and an opportunity to respond to the BIA's judicially noticed facts, the BIA would not remand to the immigration judge. Instead, the noncitizen may only respond in writing to the BIA months or years after the immigration judge issued a decision. The BIA itself will determine the matter in the first instance, which is entirely inconsistent with the function of an appellate court. *See* 85 Fed. Reg. at 81,651 (new 8 C.F.R. § 1003.1(d)(3)(iv)(B)).

221.   Commenters explained that the proposal failed to articulate critical aspects of procedures that would apply to the new appellate factfinding process but Defendants largely ignored the serious problems they identified.

222.   For example, Defendants "recogniz[ed] that parties may disagree over whether a fact is truly undisputed," but responded that "factual disputes are already a common feature of immigration proceedings and can be resolved under existing law." *Id*. at 81,603. But resolving factual disputes is not ordinarily the role of an appellate court. Under existing law, the BIA is not

---

[35] *See* Human Rights Watch, *You Don't Have Rights Here* (Oct. 16, 2014), https://bit.ly/39a3cmo (reporting CBP officers' failure to screen protection claims and recording wrong information); *see also, e.g.*, *Singh v. INS*, 292 F.3d 1017, 1021–24 (9th Cir. 2002) (discrediting the reliability of CBP airport interviews as "not sufficient standing alone" to be a reliable impeachment source).

empowered to address these factual disputes and lacks a process to resolve them.

223.   Given the significant departure from prior practice, Defendants were required to have articulated a more detailed justification for their approach. They did not.

224.   Defendants also failed to consider the serious harm the Rule would inflict on people in removal proceedings and legal service providers placed in the position of defending against the BIA's new factfinding and prosecutorial role. Defendants assert that parties will have an opportunity to respond but that opportunity is limited to when the BIA reverses on the basis of new facts. 85 Fed. Reg. at 81,604.

225.   Defendants also disregarded the fact that the noncitizen's only recourse is to appeal the BIA's factfinding to the courts of appeals or pursue otherwise unnecessary motions practice. These options will only prolong proceedings and negate any purported gains.

### 7.      Authority for BIA to Affirm on Any Basis in the Record

226.   The Rule permits the BIA to affirm the underlying decision of the immigration judge on "any basis" supported by the record, including on the basis of "undisputed" facts or "facts that are not reasonably subject to dispute, such as undisputed facts in the record," 85 Fed. Reg. at 81,651 (new 8 C.F.R. § 1003.1(d)(3)(v)). This allows impermissible factfinding by the BIA and deprives noncitizens of the opportunity to challenge those determinations in the first instance.

227.   The Rule effectively permits a second adjudication of cases on issues the parties did not address in the appeal because it does not limit to the "bases" upon which the BIA may affirm. The Rule even allows the BIA to affirm denials on the basis of facts unrelated to the immigration judge's decision. Such facts may not have been developed or even considered by the immigration judge, much less rebutted in prior proceedings.

228.   The Attorney General's recent decision in *Matter of A-C-A-A-*, makes matters worse.  It bars reliance on immigration judge level stipulations or concessions by DHS. In combination with this Rule, the BIA could find that an element that was uncontested below was nonetheless insufficiently proven, and then affirm the immigration judge's denial on that basis, without ever giving the noncitizen an opportunity to address the issue. Defendants completely

ignored comments that the Rule would invite improper factfinding on issues reasonably subject to dispute or create absurd results when applied with *Matter of A-C-A-A-*.

229.   The Rule does not adequately explain Defendants' departure from prior practice. Defendants note that federal appellate courts may affirm the lower court on any basis in the record. 85 Fed. Reg. at 81,607. But even assuming the systems are comparable, federal appellate courts do not affirm where one party never had notice or the opportunity to respond to a disputed fact.

230.   Defendants also disregarded legal service providers' comments that the Rule's changes would require them to brief every issue that could potentially be considered, expanding briefing and requiring more time, more resources, and more requests for extensions, replies, or enlarged briefs. These consequences of the Rule negate any purported efficiency justifications. Defendants responded that an *appealing* party must address all relevant issues, 85 Fed. Reg. at 81,608; this not only misses the point but also reveals the extent to which Defendants ignored that noncitizens will, at least sometimes, be the appellee.

### 8.   Changes to the Availability of Remand for Voluntary Departure

231.   The Rule eliminates the BIA's ability to remand a case to an immigration judge "solely to consider a request for voluntary departure" or to provide instructions (i.e., "advisals") for complying with a grant of voluntary departure. 85 Fed. Reg. at 81,589 (new 8 C.F.R. § 1003.1(d)(7)(ii)(E)). Instead, the Rule authorizes the BIA to decide a request for voluntary departure as long as it was preserved below, regardless of which party appealed. *Id.* (new 8 C.F.R. §§ 1003.1(d)(7)(iv), 1240.26(k)(1)). When the BIA grants voluntary departure, the Rule requires that bond be posted within ten days of the order if served by mail or five days if served electronically. *Id.* (new 8 C.F.R. § 1240.26(k)(4)). The BIA is also responsible for advising the recipient of the terms of the voluntary departure order. *Id.*

232.   Voluntary departure is a discretionary benefit for which the noncitizen must show, among other things, five years of "good moral character," a standard that involves intensive fact finding and balancing of numerous favorable and unfavorable factors. 8 U.S.C. § 1229c(b)(1)(B); *Campos-Granillo v. INS*, 12 F.3d 849, 852 (9th Cir. 1994). The Rule allows the BIA to consider

these factual questions in the first instance and to do so based on an incomplete record.

233.   Some forms of immigration relief, such as withholding of removal and protection under CAT, do not require a showing of "good moral character," or any discretionary assessment. These forms of relief may be based on records before the immigration judge that might not include any evidence relevant to a determination on voluntary departure. If an immigration judge grants other relief and does not reach the alternative request for voluntary departure, the noncitizen will not have developed any facts in support of the request. Immigration judges ordinarily would not entertain testimony on an issue that they do not intend to reach, especially if they intend to grant a primary application.

234.   But under the Rule, immigration judges must develop the record on voluntary departure for all applicants who are apparently eligible so that the BIA can make decisions with respect to voluntary departure in the first instance. This is terribly inefficient because it forces all immigration judges to develop a voluntary departure record in case DHS appeals the grant of some other relief, and the BIA sustains.

235.   The Rule also creates the risk of inadvertent non-compliance. The Rule requires the BIA to give advisals about the consequences of failing to comply with voluntary departure but does not explain how the BIA will do this in the context of a paper-based appellate process in which the noncitizen never appears in person. By contrast, in-person advisals by an immigration judge are conducted in the noncitizen's native language and permit the noncitizen to ask questions.

236.   "Voluntary departure is an agreed-upon exchange of benefits, much like a settlement agreement." *Dada v. Mukasey*, 554 U.S. 1, 19 (2008). For that reason, immigration judges "shall advise the [noncitizen]" of all the boilerplate conditions, including the conversion of the voluntary departure order into a removal order for failure to comply, as well as any additional terms "beyond those specifically enumerated" before granting voluntary departure. 8 C.F.R. § 1240.26(c)(3). Only after the conditions are "set forth" can the noncitizen accept or refuse the grant of voluntary departure. *Id.* The Rule abandons these safeguards that exist only in in-person hearings.

237.   The Rule's five- or ten-day bond requirement is woefully insufficient when such

substantial rights are at stake. It is very unlikely that applicants would even receive the BIA order within sufficient time to post the bond, especially factoring in mail delays. Even if the BIA institutes e-filing, these problems will persist because many indigent noncitizens do not have regular access to the internet. The situation will be even more challenging for detained noncitizens who routinely encounter problems with detention centers' mail systems and rarely have internet access.

238.   The Rule is also arbitrary because it gives noncitizens just days to pay a substantial sum of money even though noncitizens may wait months or years for a BIA decision, often without work authorization. And under the Rule, a one-week delay in collecting the funds is likely to result in the conversion of voluntary departure into a removal order. For someone who sought voluntary departure in order to pursue family reunification through consular processing from abroad, the consequence of this one-week delay will be ten years of family separation because of a statutory bar to reentry following a removal order. *See* 8 U.S.C. § 1182(a)(9)(A)(ii). Defendants failed to consider this serious problem.

239.   The Rule also does not afford the opportunity to challenge lack of notice, seek additional time, or request an appropriate amendment to the terms of a voluntary departure order. With just a written advisal, BIA members will not even be able to ensure that the noncitizen can read and understand the order.

240.   As a result of the Rule, countless voluntary departure applications will be denied on an insufficient record or converted to removal orders for non-compliance. Those who suffer these harsh consequences have no recourse: The INA bars further appeal to a circuit court. *See* 8 U.S.C. §§ 1229c(f); 1252(a)(2)(B)(i). Requests for amendments are also impossible because filing a motion to reopen or reconsider at the BIA will result in termination of voluntary departure. 85 Fed. Reg. at 81,656 (new 8 C.F.R. § 1240.26(k)(4)). Defendants did not give adequate weight to these serious consequences.

241.   Defendants did not offer a reasoned response to comments raising these concerns. Instead, Defendants relied on the incorrect assumption that the noncitizen would have necessarily developed the record for voluntary departure before the immigration judge, and that the "[t]he

requirements for [voluntary departure] . . . involve determinations that the [BIA] already makes." 85 Fed. Reg. at 81,640. But while the BIA may *review* questions relating to good moral character, it does not make such determinations in the first instance.

242.   Defendants made only a slight revision to the proposed Rule in response to the problems commenters identified. The final Rule allows the BIA to grant voluntary departure even where the request was not developed before the immigration judge because alternate relief was granted, *see id.* at 81,641. That does not solve the problems with the Rule; the BIA will *still* be unable to determine a noncitizen's eligibility for relief if the issue of good moral character was not before the immigration judge.

243.   Defendants entirely disregard concerns that issuing a notice written in English, and delivered by mail—which requires possibly indigent individuals to post a bond within days— will lead to unjust conversions of voluntary departure grants to orders of removal. *See id.* Defendants refuse to acknowledge the significant difference between an oral advisal, with an interpreter and the ability to ask questions, and a letter received in the mail months or years after the individual last appeared before the immigration judge.

### 9.   Changes to Remand for Background Checks

244.   Background checks (also called "biometrics") are required for most forms of immigration relief. 8 C.F.R. § 1003.47(b). Under the Rule, the BIA must now "hold" a noncitizen's case for up to 180 days until DHS reports the results of the background checks instead of remanding to the immigration judge. 85 Fed. Reg. at 81,651–52 (new 8 C.F.R. § 1003.1(d)(6)(ii)). Respondents must await instruction from DHS to complete background checks. *Id.* If the respondent fails to respond to DHS's instructions within 90 days (or 120 days, with one 30-day extension), the application will be deemed abandoned. 85 Fed. Reg. at 81,651–52 (new 8 C.F.R. § 1003.1(d)(6)(ii)).

245.   This new process only harms noncitizens. It provides no recourse to the noncitizen if the application is wrongfully deemed abandoned. *See id.* But if DHS fails to timely complete background checks, the case will be remanded to the immigration judge. *Id.*

246.   These changes abandoned safeguards which previously required DHS to notify the

respondent *in person at an immigration court hearing* of the background check requirements and provide instructions for compliance, and for the immigration judge to "specify for the record when the respondent receives" this information, along with a warning about the consequences of failing to do so. 8 C.F.R. § 1003.47(d). Under the Rule, if background checks are outstanding months or even years after relief was first sought before the immigration judge, DHS will mail out instructions.

247.   Completing background checks requires travel to a particular law enforcement agency or DHS office. Many people face obstacles during the process and require additional time. Notices sent by mail may be delivered to the wrong address, or may be mailed with insufficient time for completion.

248.   Under the Rule, the BIA is authorized to order removal based on noncompliance with a technical requirement that may be exceedingly difficult to satisfy. Deeming a fully-adjudicated and granted application, such as asylum, abandoned in these circumstances is unnecessarily harsh and will prevent many noncitizens from receiving the relief they have already been granted. Defendants failed to give adequate weight to this serious problem.

### 10.   Elimination of the BIA's Self-Certification Authority

249.   The Rule eliminates the BIA's self-certification authority that BIA historically used to cure untimely appeals or other filing defects based on extraordinary circumstances, and to review decisions that were not appealed despite clear errors or misconduct committed by the immigration judge. *See* 8 C.F.R. § 1003.1(c). This change will make it practically impossible to access the appellate process in some circumstances. Many noncitizens—especially those who are detained or *pro se*— will be denied the opportunity to appeal adverse decisions, or will need to use their single motion to reopen to challenge technical defects and delays beyond their control.

250.   Defendants do not have a reasoned basis for eliminating the BIA's ability to cure minor defects. Defendants claim that such authority lacks clear standards and assert without evidence that self-certification authority has been applied inconsistently or abusively. 85 Fed. Reg. at 81,596. As commenters showed, Defendants' premise is wrong.  The BIA's self-certification authority is "uncommonly used" and "allows the BIA to correct injustices" like mail delays

outside the parties' control.[36]

251.   Defendants do not adequately explain their refusal to consider obvious alternatives like issuing a clearer standard. Defendants contend that BIA members have "disregard[ed]" existing standards, and there is "no effective check on its usage." 85 Fed. Reg. at 81,596. They offer no evidence to support these contentions. Nor do they explain why it is reasonable to burden noncitizens and their counsel to solve a purported problem of the BIA's own making.

252.   Moreover, commenters explained that the Rule would disproportionally impact *pro se* individuals. In response, Defendants merely repeated the assertions that most noncitizens are represented on appeal and that the BIA Pro Bono Project is an effective backstop. *See* 85 Fed. Reg. at 81,596–97. These excuses do not suffice.

253.   Defendants failed to consider Rule's impact on detained noncitizens. Many factors beyond the control of noncitizens in detention might prevent them from timely filing a notice of appeal.  For example, detained noncitizens face challenges such as mail processing delays, lockdowns due to illness, and lack of access the commissary to purchase stamps. The Rule eliminates an important remedy for these situations.

### 11.    Immigration Judge Certification of BIA Decisions

254.   The Rule establishes a so-called "quality assurance certification process" that permits "an immigration judge to certify BIA decisions" that reverse the immigration judge's prior decision "for further review by the Director in situations in which the immigration judge alleges that the BIA made an error." 85 Fed. Reg. at 81,590. The Rule permits the Director, an administrator charged with the day-to-day management of EOIR,[37] to then decide the legal dispute between the immigration judge and the BIA, including by issuing "a precedent decision." 85 Fed. Reg. at 81,653.

255.   This procedure allows an immigration judge to attempt to overturn a ruling in favor of one the parties before it, placing the immigration judge in the position of advocating against

---

[36] *See, e.g.*, AILA Comment at 13.

[37] *See* 8 C.F.R. § 1003.0(b); *see also supra* Part IV.

one of the litigants. As former immigration judges explained in their comment, "[i]t is wholly inappropriate for a trial judge to have the authority to appeal from an appellate tribunal's decision which reverses her/him . . . . Immigration judges are neutral arbitrators, not parties in the cases they hear."[38]

256.   Absent specific delegation of authority from the Attorney General, the EOIR Director is prohibited from adjudicating cases. 8 C.F.R. § 1003.0(c). The Rule's new "quality assurance certification process" establishes a substantive process of reviewing and reversing BIA decisions, *see* 85 Fed. Reg. at 81,590, and thus falls squarely within section 1003.0(c)'s prohibition on Directorial adjudication without delegation by the Attorney General.

257.   The Rule does not cite any authority that confers on the Director the authority to adjudicate cases. It asserts that "[r]eviewing certified cases falls within the 'such other authorities' provided to the Director by the Attorney General," contained in 8 C.F.R. § 1003.0(b)(1)(ix), and also points to 8 C.F.R. § 1003.1(e)(8)(ii). 85 Fed. Reg. at 81,626. But neither provision delegates to the Director the authority to review BIA decisions in the way the Rule permits.

258.   In particular, 8 C.F.R. § 1003.0(b)(1)(ix) provides that the Director may "[e]xercise such other authorities as the Attorney General may provide." This general statement only leaves open the possibility that the Attorney General will delegate additional powers to the Director. It does not itself delegate any authority, let alone the authority that the Rule attempts to grant to the Director. *See* 85 Fed. Reg. at 81,590. In all events, the recognition that the Attorney General *could* delegate other authorities does not override section 1003.0(c)'s explicit prohibition on the Director adjudicating immigration cases.

259.   Nor does the Rule itself constitute a delegation, because it was signed by the Director of EOIR rather than the Attorney General. 85 Fed. Reg. at 81,656; *see* 8 C.F.R. § 1003.0(c) (limiting the authority of the Director to adjudicate cases "[e]xcept as provided by statute, regulation, or delegation of authority from the Attorney General,").

260.   Defendants also cite 8 C.F.R. § 1003.1(e)(8)(ii) but that provision does not authorize

---

[38] Public Comment of Round Table of Immigration Judges at 10–11 (Sept. 24, 2020), http://bit.ly/3oFfRE8.

the Director to adjudicate cases, as the Rule contemplates. That delegation merely allows the Chairman of the BIA to refer cases to the Director if a decision has not issued "within the established time limits," *id.*, in order to "ensure that adjudications are conducted in a timely manner." 84 Fed. Reg. 44,537, 44,539 (Aug. 26, 2019). This is a narrow exception to the general prohibition on the Director's ability to adjudicate cases. *Id.*

261.   No existing delegation authorizes the Director to review of BIA decisionmaking as the "quality assurance certification process" requires. The Rule therefore conflicts with 8 C.F.R. § 1003.0(c)'s prohibition on the Director engaging in such adjudication and is in excess of the Director's authority.

262.   The "quality assurance certification process" is also arbitrary and capricious. Defendants claim that the Rule "do[es] not create a higher secondary appellate review body." 85 Fed. Reg. at 81,625, but that is exactly what it does. The Rule creates a new form of appellate review because it grants the Director power to reverse BIA decisions and "issue a precedent decision" or "remand the case back to the BIA for further proceedings." *Id.*

263.   The certification process is also inconsistent with finality and timely adjudication. There is no timetable for the Director's decision. There is a high risk of significant delay when a case is certified because the Rule simultaneously assigns to the Director (with few exceptions) every case that has been pending for more than 335 days from the notice of appeal. Those cases would include most if not the vast majority of non-detained case in the past four years. 85 Fed. Reg. at 81,653. Defendants did not seriously consider this problem.[39]

264.   Defendants assert that immigration judges cannot "simply certify cases with which they disagree" and that "merely disagreeing . . . is not a basis for certification." *Id.* at 81,626. But the Rule allows immigration judges to certify based on their belief that "the BIA decision is clearly contrary to a provision of the INA, any other immigration law or statute, any applicable regulation, or a published, binding decision," that "the BIA decision is vague, ambiguous, internally inconsistent, or otherwise did not resolve the basis for the appeal," or that "a material

---

[39] *See* CLINIC Comment at 23.

factor pertinent to the issue(s) before the immigration judge was clearly not considered." *Id*. at 81,625.

265.   The Rule asserts that these are "narrow situations … tailored to quality control." *Id.* That ignores most of the grounds on which the Rule authorizes certification, and mischaracterizes others. For example, in response to the concern that "an immigration judge could solely object to a particular legal interpretation and still certify the case," the Rule states only that this would not justify certification under the "vagueness" criteria. That response ignores that the Rule permits allowing certification where an immigration judge believes the BIA decision is contrary to law, regulation, or published decision. *Id*. at 81,626.

266.   Defendants have not established a mechanism to ensure that immigration judges will not abuse this process. They assert "that these procedures will be employed infrequently" because of immigration judges' busy dockets, *see id*., but that assertion ignores that having cases remanded negatively reflects on the immigration judge's job performance, which creates an incentive to certify remanded cases.

267.   Defendants also arbitrarily refuse to allow the parties to file objections or responses to immigration certifications. Defendants contend that such an opportunity is not required because "the case was likely already briefed to the [BIA] prior to the certification to the Director." *Id*. at 81,627. But new issues or arguments might be presented in the certification, and the certification may omit an important procedural or substantive fact. Defendant do not identify any examples of courts in which a ruling can routinely be referred for review by a higher adjudicator without an opportunity for the parties to provide a response or context.

268.   Defendants also claimed that providing an opportunity for the parties to submit briefs opposing the certification would "plac[e] an additional burden on the parties." *Id*. at 81,627. This response does not consider the reasonable alternative of allowing optional response briefs, rather than mandatory ones.

269.   Defendants offer a false comparison between the new certification process and the existing authority of immigration judges to certify their decisions to the BIA. *Id.*; *see* 8 C.F.R. § 1003.7. This existing process is simply a means for immigration judges to refer a decision to the

ordinary appellate body for review, akin to the process whereby district judges can certify a case for interlocutory appeal. *See* 28 U.S.C. § 1292(b). In contrast, the Rule creates a novel situation in which a judge whose decision has been reversed can ask a non-judicial arbiter to intervene. 85 Fed. Reg. at 81,590.

270.   Defendants did not grapple with the ethical implications of converting immigration judges into advocates seeking to overturn BIA decisions in the cases they are adjudicating. Defendants attempt to minimize the immigration judge's role in the certification process as merely "flagging an issue and relaying it to the Director for examination," but do not square that characterization with the requirement that the immigration judge "specify the regulatory basis for the certification and summarize the underlying procedural, factual, or legal basis . . . necessary to relay the immigration judge's determination of error by the BIA." *Id*. at 81,627 (quotation marks omitted).

271.   The Rule also disregarded the performance metrics established for immigration judges in October 2018, under which they must maintain a low remand rate or risk discipline, reassignment, or termination.[40]   These metrics create a significant incentive for immigration judges to certify cases.

272.   Defendants rejected commenters' concerns even though they insisted elsewhere in the Rule that the BIA should be prohibited from remanding for factfinding because it would interfere with the BIA's "role as an impartial or neutral arbiter." 85 Fed. Reg. at 81,605. If requiring further factfinding is improperly partial, an immigration judge petitioning the Director to overrule an opinion in a case before her—a case that could affect her continued employment—cannot possibly be defended as "impartial or neutral." This internal inconsistency exposes the Rule as arbitrary and capricious.

---

[40] EOIR Performance Plan Adjudicative Employees (March 30, 2018), https://tinyurl.com/y58xmfms.

### 12.   Referral of Pending BIA Appeals to the EOIR Director

273.   With limited exceptions, the Rule "instructs the [BIA] Chairman to refer appeals pending beyond 335 days to the Director for adjudication," even if that appeal is days away from a determination or is particularly complex.  85 Fed. Reg. at 81,591.

274.   This provision conflicts with the INA. By statute, removal orders shall be final *only* upon the expiration of a noncitizen's right to appeal the order or "a determination *by the Board of Immigration Appeals* affirming such order."  8 U.S.C. § 1101(a)(47)(B) (emphasis added).

275.   The referral provision also conflicts with the prohibition on the Director adjudicating immigration cases, absent a specific delegation of authority from the Attorney General.  *See* 8 C.F.R. § 1003.0(c).

276.   The Rule purports to find this delegated authority in 8 C.F.R. § 1003.1(e)(8). According to Defendants, 8 C.F.R. § 1003.1(e)(8), which grants the Director "authority . . . to adjudicate BIA cases that have otherwise not been timely adjudicated," constitutes "such other authorit[y]" within the meaning of Section 1003.0(b)(1)(ix).  *See* 85 Fed. Reg. at 81,621. But §1003.1(e)(8) which provides authority for the Director to adjudicate cases on far narrower grounds than the Rule permits. Under that section, the Director is permitted to adjudicate cases only when an appeal has been pending before the BIA for more than 90 or 180 days (depending on whether the case is before a single BIA judge or a three-judge panel) from the "completion of the record on appeal." 8 C.F.R. § 1003.1(e)(8)(i).  Even then, the Director may only adjudicate the case if the Chair of the BIA elects to refer the case to the Director. *See id.* § 1003.1(e)(8)(ii).

277.   The Rule purports to authorize the Director to adjudicate cases that exceed the Attorney General's delegation in section 1003.1(e)(8). Section 1003.1(e)(8) authorizes the Director only to adjudicate cases that have been pending 90 or 180 days *from the time the record is completed—i.e.*, after the transcript and record are submitted to the BIA and "any briefs, motions, or other submissions" have been filed.  8 C.F.R. § 1003.1(e)(8)(i). This authority was "limited to only a narrow subset of EOIR cases."  85 Fed. Reg. at 69,475. The Rule exceeds the explicit limits of that delegation, granting the Director authority to adjudicate any case more than 335 days *from the filing of the notice of appeal*. *See* 85 Fed. Reg. at 81,622 (335-day period

66

includes "time for transcription, briefing, and adherence to the exiting [sic] 90- or 180-day time frames for decision"). The Rule effectively allows EOIR to grant itself authority that violates the delegation from the Attorney General.

278.   In so doing, EOIR has assigned itself authority in a large number of cases. Defendants often do not produce the briefing schedule in non-detained cases for months or even years after a notice of appeal is filed. In such cases, the Rule shifts adjudication from the BIA to the Director, even in situations where the BIA never issued a briefing schedule, or where the BIA had fewer than 90 or 180 days to consider briefs.

279.   The median time from a notice of appeal to a BIA decision is approximately 323 days and, as a result of COVID-19-related delays, it has become increasingly common for appeals to remain pending for 335 days or longer. *See* 85 Fed. Reg. at 81,619 (acknowledging the "323-day median case appeal time period"). In fact, a 2015 report shows that appeals of removal decisions averaged around 500 days.[41] The Director has thus not only given himself impermissible adjudicatory authority, he has also taken authority away from the BIA in the vast majority of non-detained cases.

280.   Referral to the EOIR Director will likely lengthen the time to decision. When the EOIR Director receives a case, he or his support staff will need to begin review of the case from scratch—even if the BIA has been working on the case for weeks or months. The Rule does not explain why this is an efficient use of resources. Nor does it offer any reason to believe that the EOIR Director and his staff will be able to adjudicate cases more quickly than BIA members, whose sole responsibility is to adjudicate cases. Tellingly, the Rule does not impose any time limits on the EOIR Director's consideration of a case. There is no reason to assume that adjudication by the EOIR Director will be any faster than BIA adjudication.

281.   Defendants asserted that the Director will decide "few, if any" appeals under the new Rule. 85 Fed. Reg. at 81,619. But Defendants acknowledge that the median case appeal takes

---

[41] Government Accountability Office (GAO), *Immigration Courts, Actions Needed to Reduce Case Backlog and Address Long-Standing Management and Operational Challenges* at 33, Fig. 7, (June 2017), https://bit.ly/2Xsp7Qi.

323 days, 85 Fed. Reg. at 52,508 n.39, meaning the Director could potentially decide thousands of appeals each year. And if the Director does not actually handle many appeals under his new referral authority, the change will also do little, if anything, to address backlogs.

282.   Commenters expressed concern that too many appeals, especially complex ones, will take longer than 335 days and so will be referred to the Director. Defendants responded by suggesting that, "for such cases that are atypical" or where "it would be appropriate for the BIA to devote additional time to completing adjudication," the BIA can take extra time without triggering the referral obligation. *Id.* at 81,622 (citing 8 C.F.R. § 1003.1(e)(8)(ii)). But Section 1003.1(e)(8)(ii) permits the BIA to extend the amount of time it has to render a decision only once the record has been completed, only for exigent circumstances as determined by the BIA Chairman, and only for 60 days. In any case, the 335-day clock runs from the time the appeal is *filed*, not from the time the record has been completed. *See* 85 Fed. Reg. at 81,653. The Rule does not identify any authority that would permit the BIA to stop the 335-day clock where delays occur during the completion of the record.

283.   The Rule does identify certain reasons for delay that are exempt from the 335-day referral requirement, *see id.* at 81,622, but does not explain why the Rule allows for some exceptions and not others. It also does not address whether these exceptions will reach a significant number of cases or explain the implications for the BIA's caseload.

284.   Defendants also did not adequately consider the costs of adjudication by a non-BIA member. The Director has no formal training or expertise in adjudicating appeals, and need not even be an attorney (as BIA members must, *see* 8 C.F.R. § 1003.1(a)(1)). This creates a substantial risk that the Director may issue erroneous decisions on some of the most complicated issues pending before the BIA.

285.   The Rule does not explain how the Director will deal with the volume of cases that will be mandatorily referred under the Rule, except to say that the Director will rely on qualified staff. *See* 85 Fed. Reg. at 81,621. That is no answer. The Director is also responsible for "ensuring the [BIA] itself has sufficient staff," *id.*, so there is no reason the caseload concerns that purportedly animate the Rule would not be better addressed by the addition of staff at the BIA.

286.   Finally, Defendants did not grapple with commenters' concerns that referral to the Director will deepen the politicization of the various immigration agencies and cast doubt on the BIA's impartiality. Defendants dismissed these concerns out of hand as nothing more than "ad hominem dislike, crude suppositions, and unfounded, tendentious accusations of bias." 85 Fed. Reg. at 81,621. But it is hardly an ad hominem attack to observe that placing adjudications in the hands of a policymaker is inconsistent with neutral judicial process.

### 13.   Mandatory Timelines and Other Changes for Adjudication of BIA Appeals

287.   The Rule arbitrarily imposes mandatory internal deadlines for adjudicating BIA appeals. Among other things, it requires initial screening for summary dismissals to be completed within 14 days of filing and a decision to be issued within 30 days. It also requires a single BIA member to determine within 14 days whether to adjudicate the case in a single-member decision or assign it to a three-member panel, reserved for more complex review. *See* 85 Fed. Reg. at 81,652–53 (new 8 C.F.R. § 1003.1(e)(8)(i)). A single BIA member can affirm the immigration judge in a two-sentence boilerplate opinion (known as an "affirmance without opinion" or "AWO"), which is ordinarily not issued in a three-member decision.[42] The Rule eliminates the requirement for immigration judges to review the transcript of an oral decision to correct mis-transcribed language or other errors before it is sent to the parties, which is currently required to be completed with 14 days of receipt. *Id*. at 81,638 (new 8 C.F.R. § 1003.5).

288.   Imposing these arbitrary adjudication timelines pressures screeners to review cases quickly rather than thoroughly. The result will be erroneous summary dismissals and AWOs. This is especially true because the BIA is already incentivized to adjudicate cases quickly in light of the 90- and 180-day adjudication requirements. The Rule will ultimately lead to more federal court appeals and remands back to the BIA.

289.   Defendants deflected commenters' concerns about these issues by mischaracterizing the commenters' concerns as attacks on the BIA members' competency and integrity. 85 Fed.

---

[42] *See* 8 C.F.R. §§ 1003.1(e)(4) (6); *Affirmance Without Opinion, Referral for Panel Review, and Publication of Decisions as Precedents*, 84 Fed. Reg. 31,463 (July 2, 2019).

Reg. at 81,617. Defendants also claimed that there was no meaningful difference between requiring screeners to adjudicate cases "promptly," which the previous regulations required, and a fixed, 14- or 30-day deadline. *Id.* Finally, Defendants dismissed comments that the recently issued case management procedures, which already established the Rule's timelines, failed to result in improved efficiency. *Id.* None of these justifications meaningfully respond to commenters' concerns.

290.   The elimination of the immigration transcript review is particularly counterproductive. EOIR contractor Booz Allen Hamilton reported that the issuance of oral decisions actually *contributes* to inefficiencies in adjudicating cases because it prevents both the parties and the BIA from deliberating on the issues of the case.[43] The Rule does not mention this countervailing data. In fact, Defendants stated that removing the transcript review process "will not affect the quality of transcriptions" at all. 85 Fed. Reg. at 81,639. Defendants did not explain why limiting the 14-day review process would reduce inefficiencies as compared to alternatives such as hiring more transcribers to produce transcripts in a timely manner after the immigration judge's review.

291.   Defendants also dismissed concerns that litigation at the courts of appeals would increase due to inaccurate or defective transcripts, thereby harming both noncitizens and their advocates, such as Plaintiffs.

### D. Defendants Failed to Comply with Federalism Certification Requirements

292.   Before issuing a rule that will have "substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government," a federal agency must assess the rule's federalism impacts, consult with state and local officials, and certify that it has done so. Exec. Order No. 13132, § 1(a), 64 Fed. Reg. 43,255 (Aug. 4, 1999).

293.   Defendants failed to examine the federalism implications of withdrawing *sua sponte* reopening authority. Crime-based grounds of removal sit at the intersection of state and federal

---

[43] *See* Booz Allen Hamilton Report at 18, 25.

interests. While state convictions trigger federal deportation grounds, it is well-settled that vacaturs based on "procedural or substantive defect[s] in the underlying proceedings" eliminate those deportation grounds. *Matter of Pickering*, 23 I. & N. Dec. 621, 624 (BIA 2003). The Rule upsets this balance by making removal orders based on state convictions permanent in many cases—even where the state has deemed the conviction legally invalid.

294.   Relatedly, the Rule undermines the efficacy of state-level efforts to undo unconstitutional convictions, and grant clemency where appropriate, for noncitizens facing deportation as a result of the state's own criminal systems. For example, California enacted legislation creating a means by which to challenge legal defects in old criminal proceedings, expressly contemplating its use by noncitizens with removal orders. *See* Cal. Penal Code §§ 1473.7(a)(1) (allowing motion to vacate "due to prejudicial error" affecting noncitizen's ability to understand immigration consequences), (b)(2) (allowing filing of motion after notice of a final removal order). Defendants gave no consideration to states' legitimate investments in such measures.

295.   Indeed, despite such clear effects on the states, Defendants claim without further explanation that the Rule "would not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement." 85 Fed. Reg. at 81,650.

**E.     Defendants Failed to Comply With the Regulatory Flexibility Act.**

296.   The Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601 et seq., requires federal agencies to conduct a "regulatory flexibility analysis" analyzing how rules they promulgate will affect "small entities," and to publish final versions of that analysis. 5 U.S.C. § 604.

297.   Plaintiff Centro Legal is an example of a "small entity" under the RFA because it is a "not-for-profit enterprise which is independently owned and operated and is not dominant in its field." 5 U.S.C. § 601(4).

298.   An agency can forgo a regulatory flexibility analysis "if the head of the agency certifies that the rule will not . . . have a significant economic impact on a substantial number of small entities" *and* publishes that certification, "along with a statement providing the factual basis for such certification," in the Federal Register when it publishes the final Rule. 5 U.S.C. § 605(b).

299.   Defendants did not conduct a regulatory flexibility analysis of the Rule. Rather, "the Department"—not the head of the agency—issued an uncertified statement that the Rule "will not have a significant economic impact on a substantial number of small entities." 85 Fed. Reg. at 81,650. Defendants likewise did not publish "a statement providing the factual basis" for the Department's claim that the Rule does not significantly impact small entities. *See id.*

300.   Defendants asserted that the Rule has no adverse impact on small entities because the Rule "does not limit the fees [practitioners] may charge, or the number of cases a representative may ethically accept under the rules of professional responsibility." 85 Fed. Reg. at 81,645. They also contended that "[t]he rule will not economically impact representatives of [individuals] in immigration proceedings." *Id.* at 81,646. These responses do not meaningfully address the significant, adverse impacts the Rule will have on the number of cases that small entities are able to handle, their ability to secure ongoing funding, and other consequences—all points that commenters raised.[44]

301.   Defendants also contend that portions of the Rule apply only to individuals and not entities. *See* 85 Fed. Reg. at 81,646. This contention disregards the direct harm to Plaintiffs and the indirect harm as a result of the Rule's impact on the populations they serve. "Congress took steps to ensure that pro bono legal services of the type that the Organizations provide are available to asylum seekers." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 768 (9th Cir. 2018) (citing 8 U.S.C. § 1158(d)(4)(A)-(B)); *see also* 8 U.S.C. § 1229a(1)(E), (b)(1)-(2). The Rule impedes Plaintiffs' and similar organizations' efforts to provide this congressionally contemplated *pro bono* service. And in all events, "small entities" can be affected by or otherwise regulated by a Rule simply by virtue of their contractual relationships with their clients. *See Aeronautical Repair Station Ass'n, Inc. v. F.A.A.*, 494 F.3d 161, 176-77 (D.C. Cir. 2007) (distinguishing the two

---

[44] *See* Public Comment of ILRC at 12 (September 25, 2020) (stating that the Rule "will create a staggering cost to legal advocates offering representation to protect procedural due process rights to immigrants in removal proceedings."), https://bit.ly/38YdUxr; Public Comment of Safe Horizons at 9 (September 25, 2020) (explaining that the changes imposed by this Rule "will in turn place an even greater burden on nonprofit organizations such as ours" and will ultimately result in the organizations being forced to turn away potential clients as a result of the organization's limited resources), https://bit.ly/3nUeUa9.

72

Circuit decisions cited by Defendants in the Rule).

302.   Defendants' failure to comply with the certification requirements under § 605(b) of the RFA was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA. *See Northwest Min. Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 16 (D.D.C. 1998) (remanding Rule to the agency due to violation of § 605(b)).

## IV.   The Rule Harms Plaintiffs

303.   Plaintiffs Centro Legal, ILRC, Tahirih, and RAICES are non-profit organizations that provide legal services to noncitizens, advocate on behalf of immigrant communities, and provide training and educational programming to immigration practitioners and/or immigrant communities. They each have significant reliance interests at stake because they have structured their missions, operations, budgets, and plans based on the law as it existed before the recent barrage of rulemaking, and with the expectation that Agencies will not arbitrarily and capriciously change regulations governing EOIR proceedings. The changes imposed by the Rule will cause Plaintiffs substantial harm.

### A.   The Rule Frustrates Plaintiffs' Missions

304.   Each of the Plaintiffs shares a mission to support and provide legal services to as many low income and vulnerable noncitizens as possible, including to asylum seekers. The Rule frustrates Plaintiffs' missions by making changes that increase the likelihood that noncitizens will be unable to vindicate their legal rights and pursue relief for which they are eligible. The Rule eliminates critical procedural devices that are currently used to correct fundamental miscarriages of justice, to allow individuals to receive relief from deportation for which they qualify, and to avoid dramatic consequences like deportation to death or torture. Many of the Rule's changes deny noncitizens a fair opportunity to present evidence. By eviscerating adjudicators' ability to manage their own proceedings, the Rule will lead to an increase in the backlog of cases in the immigration courts and the BIA, which will delay relief for noncitizens and could result in removal of people who are entitled to relief.

305.   The Rule also frustrates Plaintiffs' missions by reducing the number of clients that Plaintiffs can serve. For example, BIA appeals will be significantly more resource intensive.

Before the Rule, the record before the BIA was closed, and the briefing in nondetained cases was sequential. Because the Rule allows the BIA to engage in factfinding and to affirm an immigration judge's decision on any basis, puts new limits on extensions of time for BIA briefing, and requires simultaneous briefing, Plaintiffs' ability to present the strongest case in a 25-page brief will be severely compromised. Although the Rule affects all Plaintiffs who provide representation in BIA appeals, this will be particularly devastating to Tahirih's Atlanta office, which was opened in January of 2018 with the intent of focusing on BIA appeals. The combined effect of the changes in the Rule will make it essentially impossible for Tahirih to take on BIA appeals for noncitizens who appeared *pro se* or with other counsel in immigration court.

306.   The Rule also hinders Plaintiffs' ability to leverage pro bono attorneys to serve more clients. For example, before the Rule, Tahirih routinely referred BIA appeals to pro bono attorneys. The changes to the briefing schedule and the increased complexity of BIA appeals will make it virtually impossible to recruit pro bono attorneys for those matters. Asking a pro bono attorney to take an appeal on a closed record with the possibility of a 90-day extension of time is much different than an appeal that must cover *all* issues raised in the immigration court and is subject to additional factfinding, simultaneous briefing, and for which only a one-time extension of 14 days is possible.

307.   Similarly, the lack of availability of administrative closure will reduce the number of cases that Plaintiffs can accept. Before the Rule, Plaintiffs representing noncitizens in removal proceedings and before USCIS were able to focus on the USCIS proceedings and administratively close the removal proceedings. Now, Plaintiffs will have to pursue both tracks at the same time, which is particularly wasteful of Plaintiffs' resources because USCIS proceedings may moot the removal proceedings. Two-track cases are also more difficult to place with pro bono attorneys. This is particular true for U visa cases due to prolonged delays at USCIS. Because removal defense is much more resource intensive than USCIS proceedings, Plaintiffs will have to reduce the number of clients they serve.

308.   In short, the Rule makes immigration representation more uncertain, costly, resource intensive, and complex. It will hinder Plaintiffs' ability to manage their caseloads, which will

necessarily result in a reduced capacity to provide direct representation to clients. The Rule itself will make it much more difficult for noncitizens to obtain relief for which they are eligible. These results of the Rule all frustrate Plaintiffs' missions.

**B.    The Rule Diverts Resources from Plaintiffs' Core Programs**

309.   The Rule is causing and will continue to cause Plaintiffs to divert resources from their core programs. Before the effective date of the Rule, each Plaintiff had to expend significant resources—including by diverting resources from its core programs—to analyze and interpret the Rule, screen existing cases to determine whether immediate action needed to be taken before the Rule took effect, create new informational materials and resources to address the Rule, and provide training to its attorneys and staff.

310.   Additionally, several of the Plaintiffs provide training and support to other legal services providers, practitioners, and/or directly to immigrant communities, which will require them to expend substantial resources in the near term on tasks such as drafting client alerts, designing and hosting webinars, and updating any website content concerning removal proceedings and BIA appeals.

311.   Likewise, all Plaintiffs anticipate needing to rework their existing training materials to ensure their staff understand the entire gamut of the Rule's new substantive and procedural requirements, which will take a tremendous amount of time and workforce effort that the Plaintiffs cannot afford to spare. This will be especially burdensome for Plaintiff ILRC, which maintains a substantial series of immigration law publications that will all need to be reviewed and updated in addition to revamping its curriculum for removal defense roundtables, trainings, and webinars.

312.   The Rule will also impose increased costs on Plaintiffs that will not be able to refer as many cases to pro bono attorneys. Plaintiffs will expend more resources to provide direct representation to the noncitizens who would have otherwise been referred. Decimating pro bono programs will also result in an increase in expenses for Plaintiffs because pro bono attorneys often pay the filing fees for noncitizens. Plaintiffs will now have to find a way to cover those fees for noncitizens, who are indigent and unlikely to be able to afford them. The burden will be particularly high for motions to reopen, which will increase in cost as a result of the EOIR Fee

1    Rule.

2        313.   The Rule will also complicate, prolong, and require more resources for Plaintiffs'

3    representation of existing and future clients. For example, in place of motions to remand for new

4    evidence, the Rule directs noncitizens to file motions to reopen, which may only be filed *after*

5    removal proceedings have concluded before the BIA, *i.e.*, when an order of removal becomes

6    final. *See* 85 Fed. Reg. at 81,611 & n.27. The purported goal of this Rule is efficiency, but this

7    change will delay proceedings by months or even years, and it will force Plaintiffs to litigate and

8    the BIA to adjudicate appeals on possibly outdated facts that would not have previously been

9    necessary with a remand. In addition, this approach ignores the significant consequences that flow

10   from an order of removal, including a substantial risk of removal from the United States,

11   prolonged family separation, and other attendant consequences.

12       314.   As a result of changes in the Rule, Plaintiffs will be required to file more motions to

13   reopen, which are subject to time and number bars and, under the EOIR Fee Rule, exorbitant fees.

14   While motions to remand are free of cost, motions to reopen will cost $895 under the EOIR Fee

15   Rule. The new fees will also force Plaintiffs to consider assisting noncitizens with finding

16   resources to pay the fees or filing time-consuming waivers. Because filing a motion to reopen uses

17   an applicant's one chance to do so, this change will significantly increase the amount of time and

18   resources Plaintiffs will require to prepare each motion and advise clients.

19       315.   The change is also likely to prolong Plaintiffs' representation, likely by years, by

20   forcing additional circuit court appeals. It would also require Plaintiffs to seek a stay of removal,

21   likely within days of the BIA's decision, in order to avoid the client's deportation, which likely

22   would require concurrent requests to the BIA and to the circuit court. Because each of these

23   additional steps takes considerable time and resources, the Rule will hinder Plaintiffs' ability to

24   represent additional clients.

25       316.   Moreover, if noncitizens are removed while seeking a motion to reopen—a risk that

26   is not present in seeking a motion to remand, since the appeal is still pending—Plaintiffs will also

27   have to divert resources to cover the additional costs associated with representing clients from

28   abroad and possibly even assisting the client's return to the United States.

317.   Plaintiffs will also be forced to divert resources if their cases that are currently administratively closed are re-calendared. Plaintiffs' workload will expand dramatically in a short amount of time. Plaintiffs will need to repeatedly move for continuances before EOIR. Because motions for continuances are not always ruled on before hearings, Plaintiffs may need to appear personally in immigration court to report that USCIS proceedings remain ongoing. For attorneys in RAICES's Austin office, this means traveling to immigration court in San Antonio and sometimes waiting an hour or more as the immigration judge hears other matters. If further continuances are denied, Plaintiffs will then also need to prepare for merits hearings on complex applications for relief.

318.   Each of the tasks and expenses necessary to respond to the new Rule—including those described above—requires Plaintiffs to divert their finite resources from other aspects of the programs they provide. As a result of the Rule, Plaintiffs anticipate the need to make changes including reallocating staffing, devoting less time to advocacy projects and community initiatives, and taking on fewer cases.

## C.    The Rule Jeopardizes Plaintiffs' Funding

319.   Some Plaintiffs rely in part on grants from sources such as states, counties, and foundations. Such grants are often conditioned on Plaintiffs' ability to achieve certain "deliverable requirements," such as a total number of clients served or asylum applications filed each year. Because the Rule will reduce the number of clients that Plaintiffs can serve, Plaintiffs are unlikely to be able to comply with existing funding requirements—and thus expect to lose a substantial amount of their funding once this Rule goes into effect.

320.   Even under the best of circumstances, the loss of a significant source of funding could have cascading and devastating impacts for the Plaintiffs. With less funding, Plaintiffs will be forced to reduce staff and thus further reduce the number of clients served. With respect to the new Rule, the harm caused by the loss of funding will be further exacerbated by the concomitant increase in demands on Plaintiffs' resources.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Violation of the APA (Arbitrary and Capricious)

321.   Plaintiff realleges and incorporates the paragraphs above.

322.   Defendants' publication of the Rule in the Federal Register is "final agency action for which there is no other adequate remedy in a court" and is therefore subject to APA review.

323.   The APA provides that a court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

324.   In promulgating the Rule, Defendants "failed to consider an important aspect of the problem, offered an explanation for [their] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43.

325.   In particular, although Defendants assert that the Rule will ensure the consistency, efficiency, and quality of adjudications, Defendants failed to articulate a satisfactory explanation for their actions, including a rational connection between the facts found and the choice made. The justifications offered by Defendants are unsupported by evidence.

326.   Contrary to the stated goal of efficiency, elimination of administrative closure will increase inefficiencies. Immigration judges will be forced to hold hearings and rule on repeated motions for continuances while USCIS processes pending applications for relief.

327.   As another example, the Rule's elimination of motions to remand will require the BIA to adjudicate pending appeals even when evidence presented in a motion to remand could eliminate the need to do so.

328.   Likewise, shortening the briefing extension period for BIA appeals will not improve operational efficiency because delays in adjudication at the BIA are not attributable to the time the parties are briefing. *Cf.* 85 Fed. Reg. at 81,638.

329.   The Rule is arbitrary and capricious and should be set aside under the APA because Defendants departed from longstanding policies without assessing reliance interests or giving a

reasoned explanation for the changes.

330.   When an agency substantially alters its position, it must "supply a reasoned analysis for the change." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42. Likewise, it may not "depart from a prior policy sub silentio or simply disregard rules that are still on the books." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

331.   Defendants departed from longstanding policies that permitted administrative closure, motions to reopen or reconsider cases *sua sponte*, and motions to remand without assessing reliance interests associated with the existing policies or alternatives within the ambit of the existing policy. Defendants similarly failed to justify their conversion to universal concurrent briefing schedules, a policy they had previously considered and explicitly rejected.

332.   Defendants failed to consider the reliance interests of Plaintiffs and other pro bono legal service providers that have designed programs and accepted cases with the reasonable expectation that Defendants would not arbitrarily and capriciously change EOIR procedures. Because the Rule will make many cases more time and resource intensive, the Rule affects Plaintiffs' capacity to serve the same number of clients and their ability to manage their pending cases.

333.   The Rule is arbitrary and capricious because it implements changes to administrative closure without addressing the benefits of this procedural tool or the harm that eliminating it will cause.

334.   The Rule is arbitrary and capricious because it does not adequately weigh the serious risk of refoulement, despite that concern being raised by comments on the proposed rule.

335.   The Rule is arbitrary and capricious and should be set aside under the APA because Defendants failed to consider important aspects of the problem, including how the shortened briefing extension time period would reduce legal representation at the BIA, the impact on noncitizens who are effectively barred from reopening or reconsideration under the Rule, and the Rule's interaction with other rules impacting noncitizens, including those issued through staggered rulemaking.

336.   As explained throughout this Complaint, Defendants arbitrarily and capriciously

failed to analyze many other substantial issues and reasonable alternatives raised in comments.

337.   For these and other reasons stated above, the Rule is arbitrary and capricious and thus unlawful under the APA.

338.   Defendants' violation is causing ongoing harm to Plaintiffs.

## SECOND CLAIM FOR RELIEF

### Violation of the APA (Without Observance of Procedure Required by Law)

339.  Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

340.  Defendants' publication of the Rule in the Federal Register is "final agency action for which there is no other adequate remedy in a court" and is therefore subject to APA review.

341.  The APA requires an agency proposing a rule to provide notice and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

342.  The APA provides that a court "shall . . . hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

343.  Defendants violated the APA by providing the public with just 30 days to comment on the proposed rule.

344.  The Rule's 30-day comment period was inadequate to give interested persons a meaningful opportunity to participate in light of the number of changes to immigration court and BIA procedure effected by the Rule and the unique challenges affecting interested persons during the COVID-19 pandemic.

345.  The Rule was also part of an improperly staggered rulemaking process in which various rules affecting noncitizens with orders of removal were proposed at different times, preventing the public from understanding and commenting on the final regulatory regime.

346.  Defendants also failed to analyze the Rule's federalism implications as required by Executive Order No. 13132, 64 Fed. Reg. 43,255 (Aug. 4, 1999).

347.  The agency failed to comply with the requirements of the Regulatory Flexibility Act ("RFA").

348.  The Rule is a "rule" within the meaning of the RFA. *Id.* § 601(2).

349.  The RFA requires federal administrative agencies to analyze the effects on "small entities" of rules they promulgate, and to publish initial and final versions of those analyses. *See* 5 U.S.C. §§ 603–604.

350.  The RFA defines "small entities" to include small businesses, small nonprofit organizations, and small governmental jurisdictions. *Id.* § 601(6). Plaintiffs are "small entities" within the meaning of the RFA and are directly affected by the Rule, which, among other things, will require them to expend substantial resources, including to update training materials and evaluate the Rule's impact on pending cases.

351.  The Rule's regulatory flexibility analysis does not comply with the RFA because Defendants concluded that the Rule will not have a significant impact on small entities. In lieu of an adequate explanation, the Rule simply asserts that the Rule "applies to [noncitizens] in removal proceedings, who are individuals, not entities," a statement that wholly ignores the impact of the Rule on Plaintiffs and other organizations that serve noncitizens in removal proceedings. 85 Fed. Reg. at 81,646.

352.  The RFA requires Defendants to describe and estimate the number of small entities that would be affected by the Rule. 5 U.S.C. § 604(a)(4). Defendants did not do so and refused to include small nonprofit organizations affected by the Rule. 85 Fed. Reg. at 81,650.

353.  As a result of the foregoing, the Rule's regulatory flexibility analysis does not comply with the RFA.

354.  Moreover, the Rule failed to give notice to interested parties that Director McHenry, rather than the Attorney General, would be issuing the Rule, in contravention of the APA and in excess of Director McHenry's statutory, regulatory, and constitutional authority.

355.  The Rule is therefore procedurally invalid and should be set aside under the APA.

356.  Defendants' violation is causing ongoing harm to Plaintiffs.

**THIRD CLAIM FOR RELIEF**

**Violation of the APA, 5 U.S.C. § 706(2)**

**Agency Action in Excess of Statutory Jurisdiction or Authority**

357.   Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

358.   The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C).

359.   In the INA and Homeland Security Act, Congress vested all of EOIR's rulemaking authority in the Attorney General alone. 8 U.S.C. § 1103(g); 6 U.S.C. § 521.

360.  The Rule cites 8 U.S.C. § 1103(g) as the statutory authority for its issuance. 85 Fed. Reg. at 81,588.

361.   Although the Attorney General signed the proposed rulemaking, he did not sign the Final Rule, which was instead signed only by Director McHenry in his role as Director of EOIR.

362.   The Attorney General's purported delegation of rulemaking authority to the Director of EOIR pursuant to Attorney General Order Number 4910-2020 violated longstanding principles of administrative law and improperly delegated authority to Director McHenry. *See Chenery*, 318 U.S. at 95; *see also N.S.*, 2020 WL 4260739, at *5–6. Director McHenry also has no statutory or regulatory authority to issue final rules independent of this unlawful delegation. *See* 8 U.S.C. § 1103(g)(2); *see also* 8 C.F.R. § 1003.0(b).

363.   Moreover, the Director of EOIR cannot use any purported delegated authority to delegate additional authority to himself.

364.   The Rule purports to grant new authority to the EOIR Director to adjudicate BIA appeals that have been pending for more than 335 days.

365.   In responding to comments about this provision, the Rule provides that, "[i]n issuing the rule, the Attorney General properly delegates adjudicatory authority to the Director to review certain administrative decisions that are otherwise untimely. 8 CFR 1003.1(e)(8)." 85 Fed. Reg. at 81,621. But the Rule was not, in fact, issued by the Attorney General.

82

366.   The Rule also purports to provide the EOIR Director with new authority to review BIA decisions in situations in which the immigration judge alleges that the BIA made an error. 85 Fed. Reg. at 81,590.

367.   In responding to comments about this provision, Defendants responded that "the Attorney General is acting within the bounds of his statutory authority when [sic] by issuing the rule." *Id.* at 81,626. But again, the Attorney General did not sign the Rule.

368.   Because Director McHenry lacked authority to issue the Final Rule, the Rule was issued "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C), and not in accordance with law, *id.* § 706(2)(A), and the Rule must be set aside.

369.   Defendants' violation is causing ongoing harm to Plaintiffs.

**FOURTH CLAIM FOR RELIEF**

**Violation of the APA, 5 U.S.C.§ 706(2)**

**Contrary to Law and In Excess of Statutory Authority**

370.   Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

371.   The APA provides that a "reviewing court shall—hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitation, or short of statutory right." *Id.* § 706(2)(C).

372.   The Rule as a whole, including the cumulative effect of its provisions, is incompatible with the overall statutory scheme governing the immigration courts and the BIA.

373.   The INA is a carefully crafted statutory scheme that creates a pathway through the immigration courts and the BIA for people to present defenses to removal and claims for relief, including a role for pro bono legal service providers.

374.   Congress intended that the INA provide for process in the immigration courts and the BIA that is fair and consistent with the requirements of due process.

375.    The Rule's effect on the operation of the immigration courts and the BIA is not in accordance with the INA and in excess of statutory authority because it obstructs the statutory path Congress created through the immigration courts and the BIA.

376.    The Rule is contrary to law and in excess of statutory authority because it drastically disadvantages individuals in immigration courts and the BIA contrary to the statutory scheme designed to provide fair access to relief consistent with principles of due process.

377.    The legislative purpose of providing fair access to immigration courts and the BIA is evidenced in the many provisions of the INA that the Rule contravenes, including but not limited to:

- 8 U.S.C. § 1229a(b)(4)(B), which provides that noncitizens have a right to a "reasonable opportunity to examine evidence" against them and to present evidence of their own.
- 8 U.S.C. § 1101(a)(47)(B), which provides that an order of removal becomes final upon "a determination by the [BIA]" or the expiration of a noncitizen's time to appeal to the BIA.
- 8 U.S.C. §§ 1229a(1), (a)(3), and (c)(1)(A). Under these provisions, an immigration judge, not the BIA, shall conduct removal hearings and order removal.
- 8 U.S.C. § 1182(a)(9)(B)(v), which allows noncitizens to seek a provisional hardship waiver of unlawful presence in the United States.
- 8 U.S.C. §§ 1158(a)(1) and 1231(b)(3). The first provision allows any noncitizen who is present in the United States to apply for asylum. The second provides mandatory relief from removal in cases where there is a clear probability that the individual will be persecuted abroad.

378.    The Rule as a whole, including the cumulative effect of all its provisions, is contrary to law and in excess of statutory authority because the Rule is incompatible with the overall statutory scheme governing proceedings in the immigration courts and the BIA.

379.    The Rule is contrary to law and in excess of statutory authority because it cuts off access to statutory rights of asylum and withholding of removal under 8 U.S.C. §§ 1158(a)(1) and

1231(b)(3), and creates a significant danger of refoulement, which "occurs when a government returns [noncitizens] to a country where their lives or liberty will be threatened on account of race, religion, nationality, membership of a particular social group, or political opinion." *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1087–88 (9th Cir. 2020).

380.   Refoulement is prohibited under international law norms and treaty obligations that are binding on the United States. *Id.* at 1088 ("The United States is obliged by treaty and implementing statute . . . to protect against refoulement of [applicants for protection]."); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987) (explaining that Congress enacted the Refugee Act of 1980 "to bring United States refugee law into conformance with the 1967 United Nations Protocols Relating to the Status of Refugees").

381.   The Rule also violates the Due Process Clause of the Constitution, which provides that no person shall "be deprived of life, liberty, of property, without due process of law." U.S. Const. Amend. V, cl.4.

382.   The Rule also constitutes arbitrary government action that is pretext for the indiscriminate removal of immigrants from the United States in a manner incompatible with the carefully crafted scheme for proceedings in the immigration courts and the BIA.

383.   Defendants' violation is causing ongoing harm to Plaintiffs.

## FIFTH CLAIM FOR RELIEF

### Violation of the Due Process Clause

384.   Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

385.   The Due Process Clause of the Fifth Amendment of the Constitution guarantees that people cannot be deprived of life, liberty, or property without due process of law.

386.   The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotations and citations omitted). Procedural due process also "protect[s] a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983).

387.   The INA is a statutory scheme that creates a pathway through immigration courts and the BIA for people to present defenses to removal and claims for relief, with a role for pro bono legal service provides to represent them in that process.

388.   The Due Process Clause and the INA create a right to counsel and a right to a fair proceedings in both the immigration courts and the BIA. The INA and its implementing regulations promote representation from pro bono legal services providers, including by requiring that noncitizens in removal proceedings be provided with a List of EOIR Pro Bono Service Providers.

389.   The Final Rule as a whole, and by virtue of the cumulative effect of all its provisions, arbitrarily, and by deliberate design, obstructs the statutory pathway through immigration courts and the BIA.

390.   Defendants have been deliberately indifferent to whether legal service providers and their clients have access to full and fair processes in the immigration courts and the BIA.

391.   Defendants have by deliberate design obstructed access to rights the Due Process Clause and the INA provide for noncitizens in the immigration courts and the BIA, unconstitutionally depriving pro bono legal service providers and the communities and individuals they serve of their vested interests.

392.   The Final Rule, including by virtue of the cumulative effect of all its provisions, violates the Due Process Clause because it is pretext for the indiscriminate removal of noncitizens from the United States without a legitimate purpose.

393.   Defendants' violation is causing ongoing harm to Plaintiffs.

## JURY DEMAND

394.   Plaintiffs demand a jury trial on all counts triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.      Assume jurisdiction over this matter;

b.      Issue a preliminary injunction under Federal Rule of Civil Procedure 65 enjoining Defendants and all those acting on their behalf from implementing or enforcing the Rule, or in the

1    alternative, issue an order under 5 U.S.C. § 705 postponing the effective date of the Rule pending

2    judicial review;

3            c.      Declare the Rule arbitrary and capricious under 5 U.S.C. § 706(2)(A) and without

4    observance of procedure required by law under 5 U.S.C. § 706(2)(D);

5            d.      Hold unlawful and set aside the Rule under 5 U.S.C. § 706(2);

6            e.      Permanently enjoin Defendants and all those acting on their behalf from

7    implementing or enforcing the Rule;

8            f.      Award Plaintiffs costs and reasonable attorneys' fees under the Equal Access to

9    Justice Act, 28 U.S.C. § 2412, and any other applicable basis; and

10           g.      Grant such further relief as the Court deems just and proper.

11                                                              Respectfully submitted,

12

13   Dated: January 19, 2021                         */s/ Naomi A. Igra*

14   Jingni (Jenny) Zhao (SBN 284684)              Scott T. Nonaka (SBN 224770)
     jennyz@advancingjustice-alc.org              snonaka@sidley.com
15   Glenn Michael Katon (SBN 281841)             Irene Yang (SBN 245464)
     glennk@advancingjustice-alc.org             irene.yang@sidley.com
16   Anoop Prasad (SBN 250681)                    Naomi A. Igra (SBN 269095)
     anoopp@advancingjustice-alc.org             naomi.igra@sidley.com
17   ASIAN AMERICANS ADVANCING                    Stephen Chang (SBN 312580)
     JUSTICE – ASIAN LAW CAUCUS                   stephen.chang@sidley.com
18   55 Columbus Avenue                           SIDLEY AUSTIN LLP
     San Francisco, CA 94111                      555 California Street, Suite 2000
19   Phone: (415) 848-7710                        San Francisco, CA 94104
     Fax: (415) 896-1702                          Phone: (415) 772-1200
20                                                Fax: (415) 772-7400
     Judah Lakin (SBN 307740)
21   judah@lakinwille.com                         Seferina Berch (*pro hac vice* forthcoming)
     Amalia Wille (SBN 293342)                    sberch@sidley.com
22   amalia@lakinwille.com                        Michael McGuinness (*pro hac vice*
     LAKIN & WILLE LLP                            forthcoming)
23   1939 Harrison Street, Suite 420              mmcguinness@sidley.com
     Oakland, CA 94612                            SIDLEY AUSTIN LLP
24   Phone: (510) 379-9216                        787 Seventh Avenue
     Fax: (510) 379-9219                          New York, NY 10019
25                                                Phone: (212) 839-5300
                                                  Fax: (212) 839 5599
26
                                                  *Attorneys for Plaintiffs*

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF